EASTERN AIR LINES, INC., Plaintiff-Appellant-Cross Appellee,

v.

McDONNELL DOUGLAS CORPORATION, Defendant-Appellee-Cross Appellant.

No. 74–2235.

United States Court of Appeals, Fifth Circuit.

May 17, 1976.

E. Smythe Gambrell, James H. Bratton, Jr., Atlanta, Ga., Charles A. Kimbrell, William G. Bell, Jr., Miami, Fla., for plaintiff-appellant-cross appellee.

Veryl L. Riddle, Thomas C. Walsh, St. Louis, Mo., William S. Frates, Larry S. Stewart, James D. Little, Miami, Fla., for defendant-appellee-cross appellant.

Before JONES, WISDOM and AINSWORTH, Circuit Judges.

AINSWORTH, Circuit Judge:

This important Florida diversity case involves an appeal from a judgment for damages for breach of contract in favor of Eastern Air Lines against McDonnell Douglas Aircraft, Inc. based on a jury verdict in Eastern's favor for the sum of $24,552,659.11 plus costs of $241,149.02—one of the largest jury verdicts ever reviewed by this Court. Involved is a series of contracts covering the years 1965–1968 by which

Douglas Aircraft, Inc.[1] agreed to manufacture and sell to Eastern Air Lines nearly 100 jet planes for approximately a half billion dollars. Suit was filed by Eastern against Douglas on July 31, 1970, based on allegations that 90 of these planes were delivered a total of 7,426 days late. It was not until July 12, 1973, after almost three years of pretrial motions and discovery and four and one-half months of trial, that the jury's verdict was rendered in the District Court.

Our review of the case convinces us that the District Court made a diligent effort to resolve the many difficult matters before it. Nevertheless, we conclude that the trial judge committed substantial and prejudicial errors in a number of his rulings and instructions to the jury, which require reversal of the judgment and a new trial. Accordingly, we reverse and remand.

## I. *Background*

Eastern Air Lines decided in 1964 to replace what remained of its outmoded propeller-driven fleet in an effort to reverse a serious five-year financial decline. Ever since the advent of the commercial jet age in 1959, Eastern had lagged behind its competitors in the purchase of jet-powered planes. Consequently, the company's decision to order 100 new planes made it the last major trunk carrier to purchase a large number of jet aircraft.

Although Eastern is one of the largest passenger carriers in the world, its route system has historically been composed of relatively short segments. In 1964, only Boeing and Douglas could offer a small, twin-engine, short-range jet suited to Eastern's needs. Eastern's decision to purchase the Douglas DC–9 rather than Boeing's 737 was based in part on Douglas' offer to lease it a number of DC–9–14's as an interim plane until the larger "stretched" DC–9–31's were available.[2] Boeing had been unable to provide Eastern with an equivalent aircraft as a substitute for its short-haul, twin-engine 737 which was not due to be delivered until a year after Douglas was to begin producing the DC–9–31. For its longer range flights, Eastern also ordered a number of DC–8–61 jets which are Douglas' equivalent of the Boeing 707.[3]

Letters of intent providing for Eastern's lease or purchase of DC–9–14's and for its purchase of the "stretched" DC–9–31 and the DC–8 planes were signed in February of 1965. The following July, Douglas and Eastern entered into the first three of what was to be a series of eight contracts providing for the delivery of a total of 99 planes. Five of the eight contracts were amended, some a number of times, between 1965 and 1968.[4]

1. As will be noted below, Douglas merged with the McDonnell Aircraft Company on April 28, 1967 to become the McDonnell Douglas Corporation. Although we will occasionally refer to "Douglas" in discussing acts which antedated the merger, the company will generally be denominated "McDonnell" or "McDonnell Douglas" during the course of this opinion.

2. The DC–9 is a "second generation" commercial jet with two engines mounted on its tail and is designed for short to medium-haul service. The DC–9–14 is capable of carrying approximately 65 passengers while the "stretched" model DC–9–31 can carry 100 passengers.

3. The DC–8–61 planes ordered by Eastern are large (200 passenger), medium-range (2,000 miles), four-engine jets. The Model 61 is a larger and more advanced version of the DC–8 introduced in 1959.

4. SUMMARY OF CONTRACTS BETWEEN DOUGLAS AIRCRAFT AND EASTERN AIR LINES AND AMENDMENTS THERETO

| Contract No. | Date | No. of Aircraft |
|---|---|---|
| DAC 65-41-L (DC-9-14) | July 9, 1965 | 15 |
| Amendments | | |
| No. 1 | April 26, 1966 | (Decreased aircraft to 14) |
| No. 2 | May 13, 1966 | (Decreased aircraft to 13) |
| No. 3 | May 19, 1966 | (Decreased aircraft to 12) |
| No. 4 | May 27, 1966 | (Decreased aircraft to 11) |
| No. 5 | July 1, 1966 | (Decreased aircraft to 10) |
| Agreement to Terminate, dated July 14, 1966 (Terminated Contract DAC 65-41-L) | | |

Although varying in details, all the agreements are basically similar; each required Douglas to manufacture a number of planes at a stipulated price per aircraft to be paid upon the delivery of each plane at Douglas' California plant. Each jet was designated for delivery during a particular calendar month. In addition, every contract contained two provisions which are of special importance to these appeals. One clause is a choice of law provision which requires that the contracts' construction and performance be determined under California law.[5] The other provision is an "excusable delay" clause which exempts Douglas from liability for delays beyond its control and not its fault.[6]

| Contract No. | Date | No. of Aircraft |
|---|---|---|
| DAC 64-105-D (DC-9-31) Amendments | July 9, 1965 | 24 |
| No. 1 | Mar. 15, 1966 | (Increased aircraft to 27) |
| No. 2 | Mar. 15, 1966 | (Decreased aircraft to 17) |
| No. 3 | July 11, 1966 | (Increased aircraft to 39) |
| No. 4 | Aug. 18, 1966 | (Increased aircraft to 40) |
| No. 5 | Aug. 28, 1966 | (Deleted 5 options) |
| DAC 66-40-D (DC-9-31) | Mar. 15, 1966 | 10 |
| DAC 66-136-D (DC-9-31) | Aug. 28, 1966 | 5 |
| DAC 67-51-D (DC-9-31) | Oct. 5, 1967 | 12 |
| DAC 65-65-D (DC-8-61) Amendments | July 9, 1965 | 4 |
| No. 1 | Oct. 5, 1965 | (Increased aircraft to 5) |
| No. 2 | Feb. 1, 1966 | (Increased aircraft to 7) |
| No. 3 | July 12, 1966 | (Increased aircraft to 9) |
| No. 4 | Aug. 28, 1966 | (Deleted 2 options) |
| DAC 66-130-D (DC-8-61) Amendments | Aug. 28, 1966 | 3 |
| No. 1 | Mar. 20, 1967 | (No additions or deletions) |
| No. 2 | Apr. 27, 1967 | (No additions or deletions) |
| No. 3 | Oct. 5, 1967 | (Deleted 3 options) |
| DAC 67-47-D (DC-8-61) Amendment | Oct. 5, 1967 | 5 |
| No. 1 | June 10, 1968 | (Deleted 10 options) |

**5. APPLICABLE LAW AND VARIANCES**

This Agreement shall be construed and performance thereof shall be determined according to the laws of the State of California, U.S.A.

**6. EXCUSABLE DELAY**

Seller shall not be responsible nor deemed to be in default on account of delays in performance of this Agreement due to causes beyond Seller's control and not occasioned by its fault or negligence, including but not being limited to civil war, insurrections, strikes, riots, fires, floods, explosions, earthquakes, serious accidents, any act of government, governmental priorities, allocation regulations or orders affecting materials, equipment, facilities or completed aircraft, failure to obtain Federal Aviation Agency Airworthiness and Type Certificate or Certificates, acts of God or the public enemy, failure of transportation, epidemics, quarantine restrictions,

Problems developed in the Douglas-Eastern relationship before even the first plane was scheduled to be delivered. In January 1966, it became evident to both parties that Douglas would be unable to complete its DC–9–14 jets in time to meet the contract delivery dates. In an early exchange of letters on the subject, Douglas attributed the delivery delays to "our nation's rapidly increasing commitments in Southeast Asia," and Eastern replied by expressing concern and noting that "[i]t appears to us that some of this slippage really should have been avoidable."

Subsequently it appeared that the delays could not be confined to the DC–9–14 deliveries. During 1966 and 1967, Douglas repeatedly revised its scheduled delivery of DC–8's and DC–9–31's. These further delays were viewed with "great concern" by Eastern executives who informed Douglas that the late deliveries were imposing a "substantial burden" on the airline.

Throughout this period, Douglas was confronted with a mounting financial crisis which, to some extent, was the result of the DC–8 and DC–9 delivery delays. In the summer of 1966, Douglas forecast a loss of almost $30 million in its operations for the year. By November, Douglas' cash shortage reached such catastrophic proportions that the company's creditors insisted that a solvent merger partner be found. The natural choice was the McDonnell Aircraft Company whose military and space activities effectively complemented Douglas' strength in the commercial aircraft field. After McDonnell infused into Douglas over $68 million in new funds, a merger was consummated on April 28, 1967. The new McDonnell Douglas Corporation assumed all the obligations and liabilities of the former Douglas Aircraft Company.

Delivery delays continued after the merger until the last of the planes was delivered in January 1969. On the average, each of the 90 late planes was delivered 80 days after the month specified in the contract

date. Several months after performance had been completed under the last of the eight contracts, Eastern wrote McDonnell on May 29, 1969 presenting a claim for damages resulting from the late deliveries over the previous three years. The airline alleged that these delays could not be deemed excusable under the applicable clause in the agreements. McDonnell rejected the claim and suit was filed in the District Court for the Southern District of Florida.

On the order of the District Judge, the trial was bifurcated with the liability phase to be tried first; to be followed, if necessary, by a trial on damages before the same jury. The greater part of the three-month liability trial was devoted to McDonnell's efforts to prove that the delivery delays were the product of events covered by the excusable delay clause in each contract. Although McDonnell produced evidence that some of the deliveries were late because of strikes and labor shortages, the heart of its defense was that most of the delays were caused by the rapid military buildup occasioned by the war in Vietnam. During the 1966–1968 escalation of the war, the Government asked the aviation industry to accord specific military projects priority over civilian production. Although military priority, in some cases, was gained through written directives and ratings issued pursuant to the Defense Production Act of 1950 ("D.P.A."), the Government often effectively achieved the same result by more informal and less direct means. McDonnell endeavored to show that, because its subcontractors cooperated with this "jawboning" policy of the Government, there were serious delays in the delivery of parts vital to DC–8 and DC–9 production. Throughout the course of this phase of the trial, however, the District Judge took the position that the only excusable delays were those resulting from written government orders issued in strict compliance with procurement regulations. As a result, the trial

failure of vendors (due to causes similar to those within the scope of this clause) to perform their contracts or labor troubles causing

cessation, slow-down, or interruption of work, provided such cause is beyond Seller's control.

judge refused to allow the jury to consider evidence of less formal efforts by the Government to expedite military production.

McDonnell Douglas also contended that Eastern had failed to give timely and reasonable notice of the breaches, that one of the contracts was no longer enforceable, and that Eastern should be estopped from pursuing any of its claims. The District Court, however, ruled against McDonnell on all these issues.

At the close of the liability trial, the jury was instructed that McDonnell bore the burden of proving that the delays were caused by events which were excused under the contracts. Furthermore, according to the court's instructions, no event could be an excuse unless it was not reasonably foreseeable at the time the particular contract was entered into. On May 16, 1973, the jury's verdict, in the form of answers to special interrogatories, found that none of the 7,426 days of delay was excusable.

During the six-week damages phase of the trial, each side presented testimony concerning the effect of the delivery delays on Eastern's operations during the 1966–1968 period. Eastern's expert estimated the airline's lost profits to be $23,400,000 while McDonnell's expert witness was of the opinion that no such damages resulted from the delays. The airline also presented evidence to support its claims for damages resulting from surplus pilot time expense, wasted pilot training and wasted schedule expense. In addition to these claims, the District Judge permitted the jury to consider Eastern's contention that, under Florida law, it was entitled to prejudgment interest from the time of the breach. On July 12, 1973, the jury returned a special verdict awarding Eastern a total of $22,219,601 in compensatory damages and $9,650,715 in interest.[7]

7. Special Verdict
July 12, 1973
Miami, Florida

We, the jury award the Plaintiff, EASTERN AIR LINES, INC. damages as follows:

1. Lost Operating profit:

| | | | | |
|---|---|---|---|---|
| (a) DC-9-14 Aircraft for | (1) | 1966 | $ | 1,360,000 |
| (b) DC-9-31 Aircraft for | (1) | 1966 | $ | 000 |
| | (2) | 1967 | $ | 3,145,000 |
| | (3) | 1968 | $ | 2,720,000 |
| (c) DC-8-61 Aircraft for | (1) | 1966 | $ | 85,000 |
| | (2) | 1967 | $ | 8,075,000 |
| | (3) | 1968 | $ | 4,505,000 |

| | |
|---|---|
| 2. Wasted Pilot Training | $ 313,438 |
| 3. Surplus Pilot Time Expense | $ 1,816,163 |
| 4. Wasted Schedule Expense | $ 200,000 |

INTEREST: To be determined from categories 1(a)(b)(c) and 2, 3, and 4 above and 5 below.

| | | |
|---|---|---|
| 1(a)(1) | DC-9-14 Aircraft | $ 561,000 |
| 1(b)(1) | DC-9-31 Aircraft | 000 |
| 1(b)(2) | DC-9-31 Aircraft | $ 1,132,200 |
| 1(b)(3) | DC-9-31 Aircraft | 816,000 |
| 1(c)(1) | DC-8-61 Aircraft | $ 35,062 |
| 1(c)(2) | DC-8-61 Aircraft | $ 2,907,000 |
| 1(c)(3) | DC-8-61 Aircraft | $ 1,351,500 |

| | |
|---|---|
| 2. Wasted Pilot Training | $ 129,291 |

Subsequently, on McDonnell's motion for judgment notwithstanding the verdict, the District Judge, on March 26, 1974, filed an opinion holding that prejudgment interest was a matter of California law and therefore could not be awarded by the jury as a matter of right. The court, however, did exercise the discretion available to it under California law in awarding Eastern $2,333,058.11 in prejudgment interest.[8] Finally, on June 24, 1974, the District Court denied McDonnell's motion to review the $241,149.02 in costs taxed against it.

In its appeal, McDonnell Douglas' most fundamental contentions concern the District Court's rulings on excusable delay, Eastern's obligation to give reasonable and timely notice of breach, and the enforceability of one of the contracts.

Eastern appeals from the trial judge's determination that the award of prejudgment interest is controlled by California law, arguing that the jury's award of $7,753,215 in prejudgment interest should be reinstated.

## II. *Enforceability of Contract 65–41–L*

A significant preliminary issue concerns the effect to be given Douglas' agreement to lease to Eastern 15 DC–9–14 aircraft until its larger DC–9–31 planes could be delivered.[9] On July 9, 1965, Contract 65–41–L, which covered this arrangement, was executed simultaneously with a side letter agreement [10] which gave Douglas the option of selling a particular aircraft to a nonuser third party who would assume the financial burden of leasing the plane to Eastern.[11] Because of its mounting cash shortage, Douglas exercised this option on all the planes covered by Contract 65–41–L.

Pursuant to the contract and the side agreement, Douglas sold each of the first five DC–9–14's manufactured to several equipment leasing corporations. As each of these jets was delivered between April and July of 1966, Eastern and Douglas executed an amendment to 65–41–L to reflect the fact that the plane was being financed by a

| | |
|---|---|
| 3. Surplus Pilot Time Expense | $ 749,162 |
| 4. Wasted Schedule Expense | $ 72,000 |
| 5. Depreciation Reserve | $ 1,897,500 |

So say we all.

Jonathan Gillingham, FOREMAN

---

8. In addition, Eastern was awarded $514 under Rule 37(b) because of McDonnell's failure, in several instances, to comply with discovery orders.

9. The delivery dates originally specified in Contract 65–41–L are as follows:

| FAA Registration No. | Delivery Date |
|---|---|
| N8901E | March 1966 |
| N8902E | March 1966 |
| N8903E | April 1966 |
| N8904E | April 1966 |
| N8905E | May 1966 |
| N8906E | May 1966 |
| N8907E | June 1966 |
| N8908E | June 1966 |
| N8909E | July 1966 |
| N8910E | July 1966 |
| N8911E | August 1966 |
| N8912E | August 1966 |
| N8913E | September 1966 |
| N8914E | September 1966 |
| N8915E | October 1966 |

10. Side Letter Agreement No. 10, July 9, 1965.

11. Lease back financing is a way of life in the aircraft industry. Rather than borrowing the money needed to purchase a plane, a manufacturer or a purchaser causes a third party to buy the aircraft and lease it back to the airline. From the standpoint of the financing party, the lease is merely another way of lending money to the aircraft operator. Because the underlying agreement for the acquisition of the plane remains between the manufacturer and the airline, the lessor's principal function in the transaction is to supply the purchase price. The airline, on the other hand, accepts delivery and actually operates the aircraft financed by the lease back method.

third party rather than by Douglas.[12] On July 14, however, the Contract 65–41–L was terminated so that the ten DC–9–14's which remained to be manufactured could be financed as a group by Bankers Trust Company. In relevant part, the "Agreement to Terminate" provides:

> The Agreement to Lease, as amended . . . is hereby terminated and all obligations, duties and liabilities of the parties thereunder are of no further force and effect, . . . except for any liabilities and obligations which may have

accrued thereunder and which may not have been performed or discharged prior to the date hereof.

Simultaneously with the termination of Contract 65–41–L, Douglas executed a contract selling the ten planes to Bankers Trust, and Eastern executed a lease of those planes with the bank.[13] Douglas' agreement with Bankers Trust provided for delivery dates which were substantially later than those originally required under Contract 65–41–L.[14]

**12.**

Amendments to Contract 65-41-L

| Amendment No. | Date | Buyer | Aircraft No. |
|---|---|---|---|
| 1 | 4/26/66 | Railway Equipment Leasing Corporation | N8901E |
| 2 | 5/13/66 | Greyhound Equipment Leasing Corporation | N8902E |
| 3 | 5/19/66 | Greyhound Equipment Leasing Corporation | N8903E |
| 4 | 5/23/66 | Greyhound Equipment Leasing Corporation | N8904E |
| 5 | 7/1/66 | Greyhound Equipment Leasing Corporation | N8905E |

**13.** Contract 66–119–D, entitled a "Purchase Agreement" governed Douglas' sale of the ten planes to Bankers Trust. Eastern's relationship with the bank was governed by a "Lease" also executed on July 14, 1966.

**14.**

| Plane No. | 65-41-L Delivery Date | Bankers Trust Delivery Date | Actual Delivery Date | Days Late Under 65-41-L | Days Late Under Bankers Trust |
|---|---|---|---|---|---|
| N8906E | 5/66 | 7/66 | 7/19/66 | 49 | 0 |
| N8907E | 6/66 | 8/66 | 8/29/66 | 60 | 0 |
| N8908E | 6/66 | 8/66 | 9/11/66 | 73 | 11 |
| N8909E | 7/66 | 9/66 | 11/7/66 | 99 | 38 |
| N8910E | 7/66 | 9/66 | 10/27/66 | 68 | 27 |
| N8911E | 8/66 | 10/66 | 11/24/66 | 85 | 24 |
| N8912E | 8/66 | 10/66 | 11/30/66 | 91 | 30 |
| N8913E | 9/66 | 11/66 | 12/22/66 | 83 | 22 |
| N8914E | 9/66 | 11/66 | 12/29/66 | 90 | 29 |
| N8915E | 10/66 | 12/66 | 2/8/67 | 57 | 0* |
| | | | Total | 755 | Total 181 |

*Aircraft N8915E was accepted by Bankers Trust on December 31, 1966, and was therefore delivered on time.

The trial judge ruled as a matter of law that Douglas was bound by the original delivery dates specified in Contract 65–41–L for all 15 planes even though seven of them were not scheduled for delivery until after the contract was terminated.[15] In the District Judge's view, the above-quoted provision of the termination agreement preserved "any Douglas liability for late deliveries."[16] Douglas attacks this ruling as being contrary to the unambiguous language of the termination agreement.[17]

■ Under California law, the jurisdiction whose rules control the construction of all the contracts involved in this case,[18] to "terminate" a contract "means to abrogate so much of it as remains unperformed, doing away with an existing agreement upon the terms and with the consequences mentioned in the writing . . . ." *Sanborn v. Ballanfonte*, 1929, 98 Cal.App. 482, 277 P. 152, 155; *accord, Grant v. Aerodraulics Co.*, 1949, 91 Cal.App.2d 68, 204 P.2d 683, 687; *Blodgett v. Merritt Annex Oil Co.*, 1937, 19 Cal.App.2d 169, 65 P.2d 123, 125. Thus, as of July 14, 1966, Contract 65–41–L was no longer binding on Douglas unless the termination agreement specifically continued certain portions of it in effect. *See Blodgett v. Merritt Annex Oil Co., supra.*

■ There is no support in the unambiguous, if somewhat awkwardly phrased, language of the "Agreement to Terminate" for the proposition that the original delivery dates were to continue in effect after July 14, 1966. Eastern and Douglas quite explicitly "terminated all . . . obligations . . . and liabilities . . . except for any . . . which may have accrued . . . prior to [July 14, 1966]."[19] In the ordinary sense of the word,[20] "to accrue" means "to come into existence as an enforceable right."[21] Since Douglas was not required to deliver the last seven planes until after July 14, 1966,[22] no obligation to deliver these particular aircraft can be deemed to have accrued at the time Contract 65–41–L was terminated.[23]

Eastern contends, however, that its claims under Contract 65–41–L for the last seven DC–9–14's to be delivered are preserved because Douglas' obligation to deliver in a timely fashion "accrued" when the contract was first executed. If we were to adopt Eastern's view that the accrual of an

---

15. These planes, numbered N8909E through N8915E, were the last seven DC–9–14's scheduled to be delivered under Contract 65–41–L. *See note 9 supra.*

16. District Court's Order on DC–9–14 Delivery Dates, filed March 2, 1973.

17. Douglas also contends that Eastern's claims arising from the late delivery of the first five DC–9–14's to be delivered were waived by the five amendments to Contract 65–41–L which accompanied the sale of those planes to leasing corporations. For reasons to be discussed below, we do not reach this issue.

18. The relevant contract provision is set out at note 5 *supra.*

19. It is helpful to compare the wording of this provision with that of the clause inserted in the amendments to Contract 65–41–L which accompanied the sale of each of the first five planes produced under the contract. *See* note 12 *supra.* Each of these amendments specifi-

cally provided that "[a]ll the terms of this Agreement shall remain in full force and effect except as herein expressly changed . . . ."

20. In California as elsewhere, "[t]he words used in a contract must be given their ordinary meaning, unless there is evidence that the parties intended to use them in a unique sense or to give the words some different meaning." *Moss Development Co. v. Geary*, 1974, 41 Cal. App.3d 1, 9, 115 Cal.Rptr. 736, 741.

21. Webster's Third New International Dictionary 13 (unabridged ed. 1961); *see* Uniform Commercial Code § 2–725(2); *Irvine v. Bossen*, 1944, 25 Cal.2d 652, 155 P.2d 9, 13.

22. *See* note 9 *supra.*

23. As will be demonstrated below, even if these obligations were deemed to have "accrued" prior to the termination of Contract 65–41–L, they would nevertheless be barred by California's four-year statute of limitations.

obligation is the same as its creation, none of the obligations arising under the contract could be deemed terminated despite wording which is explicitly to the contrary. In short, Eastern's proposed construction would render the entire July 14, 1966 "Agreement to Terminate" a nullity.[24]

Because the termination agreement cannot reasonably be interpreted as preserving the original delivery dates for those planes manufactured after July 14, 1966, the trial judge erred in using the Contract 65–41–L schedule to measure delays in the delivery of the seven DC–9–14's which were not overdue at that time.[25] While we recognize that the termination agreement was executed at Douglas' behest in order to help it secure third-party financing, it cannot now be rewritten merely because it operates to Eastern's disadvantage. *See Cousins, Inc. v. Hastings Clothing Co.,* 1941, 45 Cal. App.2d 141, 147, 113 P.2d 878, 881. Courts cannot redraft contracts under the guise of construing them. *Hinckley v. Bechtel Corp.,* 1974, 41 Cal.App.3d 206, 211, 116 Cal.Rptr. 33, 36; *see Moss Development Co.*

*v. Geary,* 1974, 41 Cal.App.3d 1, 9, 115 Cal. Rptr. 736, 741.[26]

■ Having determined that the termination agreement forecloses any action under Contract 65–41–L for delays which occurred after July 14, 1966, we turn to McDonnell's contention that those claims which were preserved by this agreement are barred by the statute of limitations. The limitation period to be applied in this diversity case is that which would be applied by the Florida courts. *Wells v. Simonds Abrasive Co.,* 345 U.S. 514, 73 S.Ct. 856, 97 L.Ed. 1211 (1953); 2 J. Moore, Federal Practice ¶ 3.07[2] at 744–746 (1975). As the trial judge correctly held, Florida's borrowing statute refers us to the applicable statute of limitations imposed by California, the state in which this action arose.[27] Under California law, an action for breach of Contract 65–41–L must be brought within four years of the time in which it accrued. Cal.Code Civ.Pro. § 337.[28]

The District Court held that since Contract 65–41–L was not divisible, the four-

---

**24.** Eastern also points to an internal memorandum prepared by a McDonnell official in 1969 after Eastern had formally presented its claim. This document construed the termination agreement as preserving the original contract dates specified in Contract 65–41–L. Even if this document cast any light on the intention of the parties at the time Contract 65–41–L was entered into, it would not be admissible to prove a meaning contradictory to the clear language of the termination agreement. *See Brant v. California Dairies, Inc.,* 1935, 4 Cal.2d 128, 133, 48 P.2d 13, 16; *Crow v. P. E. G. Construction Co.,* 1957, 158 Cal.App.2d 271, 319 P.2d 47, 50; Cal.Civ.Code §§ 1638, 1639; Cal.Comm.Code § 2202. *See generally* R. Nordstrom, Handbook on the Law of Sales §§ 46, 53 (1970).

**25.** These are the DC–9–14's numbered N8909E through N8915E. *See* note 9 *supra.*

**26.** Inasmuch as the point was neither ruled on by the court below nor briefed before us, we intimate no view on the question of whether

Eastern was a third-party creditor beneficiary under Douglas' agreement with Bankers Trust.

**27.** Fla.Stat. § 95.10 provides as follows:
*Limitation upon causes of actions arising out of the state*
When the cause of action has arisen in another state or territory of the United States, or in a foreign country, and by the laws thereof an action thereon cannot be maintained against a person by reason of the lapse of time, no action thereon shall be maintained against him in this state.

**28.** The trial judge erred in applying the four-year limitation period established by section 2–725 of the California U.C.C. which is applicable only to actions accruing after its effective date. Cal.Comm.Code § 2725(4). Because section 2–725 was not enacted in California until 1967, Contract 65–41–L is governed by section 337 of that state's Code of Civil Procedure which applies a four-year limitation period to written contracts. These two sections, however, are in accord. *Hachten v. Stewart,* Super.Ct.1974, 42 Cal.App.3d Supp. 1, 3, 116 Cal. Rptr. 631, 632.

year limitation period did not begin to run until after October 1966, the time originally specified for delivery of the fifteenth and final plane to be manufactured under this agreement.[29] McDonnell argues that the agreement was severable because each plane was delivered and paid for separately, and therefore the statute of limitations began to run on each plane as it became overdue. However, because we hold that the July 14, 1966 agreement effectively terminated the contract, we need not decide whether Contract 65–41–L was severable or unitary.

■ There can be no doubt that Eastern's cause of action under the contract accrued, at the latest, on July 14, 1966 when, for all intents and purposes, performance under Contract 65–41–L ceased. Since this suit was filed more than four years later on July 31, 1970, Eastern's claims arising from the late delivery of the first eight DC–9–14's scheduled to be manufactured under Contract 65–41–L should have been barred by the District Court.

In conclusion, then, the termination agreement and the statute of limitations together preclude Eastern from bringing suit under Contract 65–41–L for delays in the delivery of DC–9–14 aircraft.

### III. *Notice of Breach Under the Uniform Commercial Code*

During the trial and in final instructions to the jury, the District Court held that Eastern need not prove, as a predicate for recovery in this suit, that it had given McDonnell Douglas reasonable and timely notice of the delivery delays. McDonnell strongly contests the trial judge's rulings for Eastern on this issue and argues either that the airline should, as a matter of law, be barred from any recovery or, alternatively, that the issue of timely notice should have been submitted to the jury.

■ The statute governing this question is section 2–607(3)(a) of the Uniform Commercial Code[30] which provides in part as follows:

(3) Where a tender has been accepted

(a) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy;

. . . .

McDonnell contends that the trial judge denied it the benefits of this provision, both by ruling that section 2–607 does not apply to late deliveries and by holding in the alternative that Eastern gave adequate notice. Because we are unable to agree with the District Court's ruling on either ground, we hold that the question of timely notice under section 2–607 should have been submitted to the jury.[31]

### A. *Applicability of U.C.C. § 2–607(3)(a)*

■ Even though section 2–607, by its very terms, governs "any breach," the trial court found the notice requirement to be inapplicable to delivery delays because a seller necessarily has knowledge of this sort of contract violation. Relying on the case of *Jay V. Zimmerman Company v. General Mills, Inc.,* E.D.Mo., 1971, 327 F.Supp. 1198, 1204, the District Judge concluded that no-

**29.** *See* note 9 *supra.*

**30.** As we have seen, the choice of law provision found in all the contracts refers us to California law. *See* note 5 *supra.* California has adopted section 2–607(3)(a) without change. Cal. Comm.Code § 2607(3)(a).

**31.** Notification under *section 2–607 is an integral part of a buyer's cause of action and is not* an affirmative defense of the seller. Therefore, the buyer must both plead and prove that the notice requirement has been complied with. *See Redfield v. Mead, Johnson & Co.,* 1973, 266 Or. 273, 512 P.2d 776; *L. A. Green Seed Company of Arkansas v. Williams,* Ark.1969, 438 S.W.2d 717; *Carey v. I. J. Kayle & Associates,* 1970, 122 Ill.App.2d 403, 259 N.E.2d 304; 2 R. Anderson, Uniform Commercial Code § 2–607:22–23 (1971).

tice is useless where a breach is apparent to both parties.[32] The trial court apparently was of the view that the sole function of section 2–607 is to inform the seller of hidden defects in his performance. Under this approach, the only purpose of notice is to provide the seller with an opportunity to remedy an otherwise unknown nonconforming tender. *See Reininger v. Eldon Mfg. Co.,* 1952, 114 Cal.App.2d 240, 250 P.2d 4, 8; *Chemetron Corporation v. McLouth Steel Corporation,* N.D.Ill., 1974, 381 F.Supp. 245, 254.

Section 2–607's origins, however, reveal that it has a much broader function. The Code's notice requirement was derived from decisional law in California[33] and several other states which sought to ameliorate the harsh common law rule that acceptance of goods by the buyer waived any and all of his remedies. *Franck v. J. J. Sugarman-Rudolph Co.,* 1952, 40 Cal.2d 81, 251 P.2d 949, 953; *Whitfield v. Jessup,* 1948, 31 Cal.2d 826, 829, 193 P.2d 1, 2; *see* 3 S. Williston, Contracts § 714 (rev. ed. 1961). This approach was codified under section 49

of the Uniform Sales Act[34] which was adopted in California as Civ.Code § 1769.

As Professor Williston, the author of the Sales Act, has noted, section 49 continued the common law rule treating a seller's tender of goods as an offer of them in full satisfaction. 3 S. Williston, Contracts § 714 (rev. ed. 1961). The buyer, though, was permitted to accept the offer without waiving any claims if he gave the seller prompt notice to this effect. *See Reininger v. Eldon Mfg. Co., supra,* 250 P.2d at 7. This approach reconciled the desire to give finality to transactions in which goods were accepted with the need to accommodate a buyer who, for business reasons, had to accept the tendered goods despite unsatisfactory performance by the seller. *Metro Invest. Corp. v. Portland Rd. Lumber Yard, Inc.,* 1972, 263 Or. 76, 501 P.2d 312, 314. Pre-U.C.C. decisions in California and elsewhere, therefore, recognized that the primary purpose of notice is to inform the seller that, even though his tender has been accepted by the buyer, his performance is nonetheless considered a breach of contract. *E. g., Columbia Axle Co. v. American Auto-*

---

**32.** In relevant part, the *Zimmerman* opinion reads as follows:

In the present, as in any case involving late delivery, both the seller and the buyer are necessarily fully aware *prior* to tender that the seller's contract obligation to timely deliver has not been complied with. It would be an unreasonable, if not absurd, construction of the statute to require a renewed notice of breach *after* acceptance of the goods under the facts here involved. A party has notice of a fact when he has actual knowledge of it. Section . . . 1–201(25) of the Uniform Commercial Code. The purpose of a notice in the context of this section . . . is to *inform* the seller of matters which would not normally come to the buyer's attention until *after* the goods came into his possession. The legislative intent was to make provision with respect to the effect of acceptance of allegedly defective or inferior goods or those allegedly not meeting warranted standards of quality. In that situation it is reasonable to require the buyer to inform the seller of the existence of a possible factual dispute relating to matters of which the

buyer presumably was not aware prior to his acceptance of a tender of the goods.
*Jay V. Zimmerman Company v. General Mills, Inc.,* E.D.Mo., 1971, 327 F.Supp. 1198, 1204 (emphasis in original).

**33.** *Reininger v. Eldon Mfg. Co.,* 1952, 114 Cal. App.2d 240, 250 P.2d 4, 7; *see* the authorities cited by the California Supreme Court in *Franck v. J. J. Sugarman-Rudolph Co.,* 1952, 40 Cal.2d 81, 251 P.2d 949, 953.

**34.** This provision of the Uniform Sales Act is similar in wording to section 2–607:

In the absence of express or implied agreement of the parties, acceptance of the goods by the buyer shall not discharge the seller from liability in damages or other legal remedy for breach of any promise or warranty in the contract to sell or the sale. But, if, after acceptance of the goods, the buyer fails to give notice to the seller of the breach of any promise or warranty within a reasonable time after the buyer knows, or ought to know of such breach, the seller shall not be liable therefor.
Uniform Sales Act § 49.

*mobile Ins. Co.,* 6 Cir., 1933, 63 F.2d 206, 207; *Reininger v. Eldon Mfg. Co., supra,* 250 P.2d at 8.

Under section 49 it was irrelevant whether a seller had actual knowledge of a nonconforming tender. Instead, the critical question was whether the seller had been informed that the buyer considered him to be in breach. Consequently, in Professor Williston's words, "the section is applicable not only to defects in quality but to breach of any promise or warranty, as, for instance, *delay in time.*"[35] 5 S. Williston, Contracts § 714 at 409 (3d ed. 1961) (emphasis supplied). Pre-U.C.C. decisions, therefore, applied the notice requirement in delivery delay cases.[36] Judge Learned Hand, for example, applied section 49 in a case in which performance had been delayed, noting:

> The plaintiff replies that the buyer is not required to give notice of what the seller already knows, but this confuses two quite different things. The notice "of the breach" required is not of the facts, which the seller presumably knows quite as well as, if not better than, the buyer, but of buyer's claim that they constitute a breach. The purpose of the notice is to advise the seller that he must meet a claim for damages, as to which, rightly or wrongly, the law requires that he shall have early warning.

*American Mfg. Co. v. United States Shipping Board E. F. Corp.,* 2 Cir., 1925, 7 F.2d

565, 566; *cited with approval Whitfield v. Jessup, supra,* 31 Cal.2d at 830, 193 P.2d at 4; *Reininger v. Eldon Mfg. Co., supra,* 250 P.2d at 8. *But see Johnson v. Comptoir Franco Belge D'Exportation, etc.,* 1955, 135 Cal.App.2d 683, 288 P.2d 151, 156.

As the drafters of Article 2 acknowledge, section 2–607 continues the basic policies underlying section 49 of the Uniform Sales Act.[37] Indeed, the notice requirement developed in pre-U.C.C. cases is entirely consistent with the Article 2 goals of encouraging compromise and promoting good faith in commercial relations.[38] As Comment 4 to section 2–607 indicates, the purpose of notice is not merely to inform the seller that his tender is nonconforming, but to open the way for settlement through negotiation between the parties. In the words of the California Supreme Court, "the sound commercial rule" codified in section 2–607 also requires that a seller be reasonably protected against stale claims arising out of transactions which a buyer has led him to believe were closed. *Pollard v. Saxe & Yolles Development Company,* 1974, 12 Cal.3d 374, 115 Cal.Rptr. 648, 525 P.2d 88; *see* Prosser, The Assault upon the Citadel (Strict Liability to the Consumer), 69 Yale L.J. 1099, 1130 (1960). Early warning permits the seller to investigate the claim while the facts are fresh, avoid the defect in the future, minimize his damages, or perhaps assert a timely claim of his own against third parties. *See* Phillips, Notice of Breach in Sales and Strict Tort Liability

**35.** Section 412 of the *Restatement of Contracts* states the same rule as the Uniform Sales Act. *Franck v. J. J. Sugarman-Rudolph Co.,* 1952, 40 Cal.2d 81, 251 P.2d 949, 953. Illustration (1) under section 412 gives the following example:

> A contracts to sell to B a specific automobile on June 1. A tenders it on June 15 and B accepts it without comment. On July 15, B brings an action against A for injury caused by the fortnight's delay. B cannot recover.

**36.** *See, e. g., Klein v. American Luggage Works, Inc.,* Del., 1960, 2 Storey 406, 158 A.2d 814; *Wildman Manufacturing Co. v. Davenport Hoisery Mills,* 1923, 147 Tenn. 551, 249 S.W. 984; *Trimount Lumber Co. v. Murdough,* 1918, 229 Mass. 254, 118 N.E. 280; *Mason v. Valen-*

*tine Souvenir Co.,* 1917, 180 App.Div. 823, 168 N.Y.S. 159.

**37.** The Code Comment for section 2–607 indicates that the purpose of the provision is "[t]o continue the prior basic policies with respect to acceptance of goods while making a number of minor though material changes in the interest of simplicity and commercial convenience." California Code Comment No. 4 states that the provision "continues the rule of former § 1769."

**38.** *See* Phillips, Notice of Breach in Sales and Strict Tort Liability Law: Should There Be A Difference?, 47 Ind.L.J. 457, 469 & n. 51 (1972).

Law: Should There Be A Difference?, 47 Ind.L.J. 457, 465–70 (1972); Note, Notice of Breach and the Uniform Commercial Code, 25 U.Fla.L.Rev. 520, 521–25 (1973).

Given these undeniable purposes, it is not enough under section 2–607 that a seller has knowledge of the facts constituting a non-conforming tender; he must also be informed that the buyer considers him to be in breach of the contract. The Code's notice requirement, then, is applicable to delivery delays as well as other breaches.[39] *MacGregor v. McReki, Inc.,* 1971, 30 Colo. App. 196, 494 P.2d 1297, 1299; R. Anderson, Uniform Commercial Code § 2–607:13 at 211 (1971); Note, Notice of Breach and the Uniform Commercial Code, 25 U.Fla.L.Rev. 520, 526 (1973); *see Warren's Kiddie Shoppe, Inc. v. Casual Slacks, Inc.,* 1969, 120 Ga.App. 578, 580, 171 S.E.2d 643, 645; *Beacon Plastic & Metal Prod., Inc. v. Corn Products Co.,* App.Term, 1968, 57 Misc.2d 634, 637, 293 N.Y.S.2d 429, 433. Accordingly, we decline to follow the reasoning of the *Zimmerman* decision, and we find that the trial court erred in not applying section 2–607 to the delivery delays at issue in this case.

**B. Adequate Notice Under Section 2–607(3)(a)**

Turning next to the lower court's alternative rationale for ruling against McDonnell on the issue, we must determine whether the notice given by Eastern was both sufficient and timely as a matter of law. Finding the facts "essentially uncontradicted," the trial court concluded that Eastern adequately informed McDonnell that it considered the delivery delays to be an actionable breach:

> Eastern's management repeatedly protested the delays and requested negotiation of the dispute, but they were always put off by McDonnell Douglas with the assurance that the matter would be taken

up once the assembly line was back on schedule. When production was again on-line many months later it became obvious to Eastern that no good-faith settlement negotiations would take place.[40]

Because the court's ruling was, in effect, a directed verdict, it can be sustained only if there is no conflict in substantial evidence and the inferences from these facts "point so strongly and overwhelmingly" in favor of Eastern that reasonable men could not have arrived at a contrary verdict. *Boeing Company v. Shipman,* 5 Cir., 1969, 411 F.2d 365, 374–75 (en banc). As will be demonstrated below, the adequacy and timeliness of notice under section 2–607 typically depend upon the reasonableness of the buyer's efforts to communicate his dissatisfaction. *See United States v. Crawford,* 5 Cir., 1971, 443 F.2d 611, 614. Therefore, whether the notice requirement has been complied with is a question which is particularly within the province of the jury. *See Pritchard v. Liggett & Myers Tobacco Company,* 3 Cir., 1961, 295 F.2d 292, 298; *L. A. Green Seed Company of Arkansas v. Williams,* Ark., 1969, 438 S.W.2d 717; 2 R. Anderson, Uniform Commercial Code § 2–607:24 (1971). As was noted by the Third Circuit:

> Where more than one inference may be drawn from undisputed facts, or the facts are disputed, the timeliness and sufficiency of a notice of breach . . . are questions for the jury to resolve. The question of reasonableness must be determined from the circumstances in the individual case.

*Pritchard v. Liggett & Myers Tobacco Company, supra* (applying Uniform Sales Act); *see Columbia Axle Co. v. American Automobile Ins. Co.,* 6 Cir., 1933, 63 F.2d 206, 208.

Applying this standard of review to the facts, we find that there was at least

---

**39.** Notice, however, is not required when the seller has failed to deliver the goods. *Chemetrom Corporation v. McLouth Steel Corporation,* N.D.Ill., 1974, 381 F.Supp. 245, 254; R. Nordstrom, Handbook of the Law of Sales 425 (1970). Section 2–607, by its terms, does not

apply where there has been no tender or acceptance of the goods.

**40.** District Court's Order Granting in Part Defendant's Motion for Judgment Notwithstanding the Verdict and Denying Defendant's Motion for New Trial, March 26, 1974.

one substantial factual dispute before the court and that the trial judge's interpretation of the facts in the case was not the only reasonable inference that could be drawn from them. We, therefore, reverse on this issue as well. We do not agree, however, with McDonnell's contention that, as a matter of law, Eastern's notice was inadequate and untimely.

As we have seen, the contractual relationship between Douglas and Eastern stretched over a number of years and was governed by a series of separate agreements, several of which were amended a number of times.[41] The complexity of these agreements and the large number of planes involved required the parties to be in constant communication with each other. Indeed, throughout this period, Eastern was informed of all significant developments by one of its own engineers who was in residence at the Douglas plant. Eastern, therefore, often knew of anticipated delivery delays before being formally informed of them by Douglas.

By early January of 1966, both parties were aware that production under Contract 65–41–L, the agreement with the earliest delivery dates, was behind schedule. Douglas did not officially notify Eastern of the impending delays until February when it sent several letters ascribing the DC–9–14 production difficulties to delays by subcontractors and a shortage of skilled labor. In Douglas' view, all of these problems were due to "our nation's rapidly increasing commitments in Southeast Asia." Douglas also indicated that it was making every effort to mitigate the impact of its subcontractors' difficulties.

Eastern replied on March 15, stating that it was "most disappointed with the delivery status" of the DC–9–14's. The airline noted that it had repeatedly expressed concern over the lack of early notification by Douglas. Without contesting Douglas' assertions concerning the Vietnam War, Eastern stated that

It appears to us that some of this slippage really should have been avoidable if

corrections had been rigorously pursued when it first became apparent. In light of this, we believe the Douglas Company has a responsibility to assist Eastern wherever possible in the reduction of our own preinauguration activities. Some of the areas that assistance would be beneficial [sic] are training (flight crews, cabin attendants, mechanics, and inspectors) and additional introductory service support.

While it may be too early to evaluate completely, we assume your corrective actions will preserve the presently planned deliveries for the DC–9–31 and the DC–8–61 currently on order by Eastern.

On May 4, Douglas wrote Eastern expressing its willingness to discuss ways of "minimizing the difficulties these delays are causing you." Douglas, however, asked the airline to defer such conversations until production was back on schedule. There was no further correspondence concerning Contract 65–41–L, and, as we have seen, the agreement itself was terminated on July 14, 1966.

By fall of 1966, however, it became apparent that there also would be delays in the delivery of the DC–9–31 and DC–8–61 planes. Between October 1966 and September of 1967, Douglas wrote Eastern at least four times informing the airline of further delays in the production of these two types of aircraft. In a September 28, 1967 letter, written after the April merger, McDonnell Douglas again attributed the delays to "the worker shortage and continuing material and equipment shortages."

Eastern's first formal response to this series of announcements came on October 6, 1967. This letter informed McDonnell that "the delays in aircraft delivery have been very expensive to Eastern Airlines and we must view continuing slippage with great concern." Eastern went on to state that

the delivery delays have cost Eastern so heavily that it would now appear that we made a mistake in going the DC–9 and DC–8–61 routes. Terms that were of-

41. *See* note 4 *supra.*

fered to us by another manufacturer would have been far less costly and although all aircraft manufacturers have suffered to some degree from common problems, it is apparent that the delivery schedule offered to us by your competitors have been more realistic than those attained by Douglas.

．　　　．　　　．　　　．　　　．

The delivery record of your current series of aircraft must necessarily be taken into account as we evaluate the purchase of the next series of airplanes. Unless there is concrete evidence that we can expect the DC–10 to be delivered in accordance with schedules offered by Douglas, it will be very difficult for us to decide in favor of your product as compared with that of another manufacturer.

On November 7, 1968, Eastern's Chief Financial Officer, Mr. Simons, wrote McDonnell Douglas asking that every effort be made to deliver several planes on schedule because a delay during the peak holiday season would place "a substantial burden on Eastern which is more severe than that imposed on your other customers."

There were no further significant written communications from Eastern until May 29, 1969 when McDonnell was formally presented with a claim for damages, in a letter from Eastern reading, in part, as follows:

> Eastern has made a full study of such delays and their economic impact and has concluded that Eastern has sustained very substantial damages as a result of delays which cannot be deemed "excusable" within the meaning of the definition in the applicable Purchase Agreements. At its meeting on May 27, 1969, our Board of Directors instructed manage-

ment to present and process a claim for such damages.

In addition to this undisputed documentary evidence, the District Court had before it testimony concerning Eastern's attitude toward the delivery delays. Eastern's Chairman, Floyd Hall, testified that he "talked with almost every one of the top officials [of Douglas and then of McDonnell Douglas] at one time or another. . . . [E]very time I met them I reminded them of the late delivery of their aircraft." W. Glenn Harlan, Eastern's Senior Vice President of Legal Affairs, also testified that he refused Douglas' request to waive the airline's claims concerning the late deliveries.

The record, however, also contains testimony that Eastern informed McDonnell executives that it did not intend to make a claim for the late deliveries. James S. McDonnell, Chairman of McDonnell Douglas, testified that, as late as October 1968, Eastern's President, Arthur Lewis, assured him that no damages would be sought. Another McDonnell executive, Jackson R. McGowan, also testified that Eastern's Chairman, Floyd Hall, told him that no legal action was contemplated.[42] These allegations were denied by Eastern's witnesses.

Eastern contends that these facts are more than sufficient to constitute adequate notice as a matter of law. The Code, in Eastern's view, does not require the buyer to inform the seller that he is presenting a claim under the contract. This contention is based on Comment No. 4 to section 2–607 which states, in part, that "[t]he content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched." Eighth Circuit decisions[43] and at least one

---

**42.** In a memorandum to Mr. McDonnell, apparently written after Eastern had formally presented its claim in 1969, McGowan wrote concerning this conversation:

> From his remarks I took him to mean that he was trying to be understanding of our problems and, did not anticipate taking legal action. On the other hand, I did not get the opinion that he was giving up his legal rights.

We note here that section 2–607 does not require an explicit waiver of legal rights for a buyer's claim to be defeated. McGowan's memorandum, therefore, does not necessarily support the trial court's directed verdict on the notice issue.

**43.** *Bonebrake v. Cox,* 8 Cir., 1974, 499 F.2d 951, 956–57 (letter informing seller that equipment not installed within meaning of contract sufficient notice as a matter of law); *Lewis v. Mobil*

commentary[44] have relied on this sentence from Comment No. 4 for the proposition that almost any indication of dissatisfaction on the buyer's part meets the requirements of section 2–607. Under this standard, there would be little doubt that Eastern's letters concerning the delays constituted sufficient notice under the U.C.C.

It appears that Comment No. 4 was aimed at remedying a rule adopted under section 49 of the Uniform Sales Act by some courts that a mere complaint of a breach was not adequate notice.[45] In California[46] and a number of other states,[47] for example, a buyer was required to indicate that he intended to look to the seller for damages. Several jurisdictions, moreover, required the buyer to specify in detail the basis for his claim that the contract was breached. *E. g., Idzykowski v. Jordon Marsh Co.,* 1932, 279 Mass. 163, 181 N.E. 172, 173.

■ These technical requirements were dispensed with because they frequently served to deny an uninformed consumer of

what was otherwise a valid claim.[48] As is noted in the draftsmen's comments, "the rule of requiring notification is designed to defeat commercial bad faith, not to deprive a good faith consumer of his remedy."[49] Eastern is therefore correct in asserting that notice under section 2–607 need not be a specific claim for damages or an assertion of legal rights. 2 R. Anderson, Uniform Commercial Code § 2–607:25 at 218 (1971).

However, the fact that the Code has eliminated the technical rigors of the notice requirement under the Uniform Sales Act does not require the conclusion that any expression of discontent by a buyer always satisfies section 2–607. As Comment 4 indicates, a buyer's conduct under section 2–607 must satisfy the Code's standard of commercial good faith. Thus, while the buyer must inform the seller that the transaction is "still troublesome," Comment 4 also requires that the notification "be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation."

*Oil Corporation,* 8 Cir., 1971, 438 F.2d 500, 509 (constant communications from buyer concerning his suspicion that improper oil was being supplied sufficient to support jury verdict of adequate notice); *Boeing Airplane Company v. O'Malley,* 8 Cir., 1964, 329 F.2d 585, 593–96 (failure to perform properly in front of seller's expert and resulting shutdown of buyer's operations sufficient evidence for jury's finding on notice).

**44.** J. White & R. Summers, *Handbook of the Law under the Uniform Commercial Code* 347–48 (1972). The authors of this treatise conclude that

> Quite clearly the drafters intended a loose test; a scribbled note on a bit of toilet paper will do. . . . Under [Comment No. 4], it is difficult to conceive of words which, if put in writing, would not satisfy the notice requirement of 2–607. Indeed a letter containing anything but the most exaggerated encomiums would seem to tell the seller that the transaction "is still troublesome and must be watched."

*See* R. Nordstrom, Handbook of the Law of Sales 430 (1970).

**45.** *See, e. g., Moosbrugger v. McGraw Edison Company,* 1969, 284 Minn. 143, 170 N.W.2d 72, 78–80; *Nugent v. Popular Markets, Inc.,* 1967, 353 Mass. 45, 228 N.E.2d 91, 94; *Clarizo v.*

*Spada Distributing Co.,* 1962, 231 Or. 516, 373 P.2d 689, 692–93, 693 n. 4; Ezer, The Impact of the Uniform Commercial Code on the California Law of Sales Warranties, 8 U.C.L.A.L.Rev. 281, 332 (1961); Project: A Comparison of California Sales Law and Article Two of the Uniform Commercial Code (Part II), 11 U.C.L. A.L.Rev. 78, 90 (1963); Note, Notice of Breach and the Uniform Commercial Code, 25 U.Fla.L. Rev. 520, 536 (1973).

**46.** *Whitfield v. Jessup,* 1948, 31 Cal.2d 826, 193 P.2d 1, 4; *see Silvera v. Broadway Department Store, Inc.,* S.D.Cal., 1940, 35 F.Supp. 625, 626.

**47.** *Clarizo v. Spada Distributing Co.,* 1962, 231 Or. 516, 373 P.2d 689, 692–93; *see Dailey v. Holiday Distributing Corp.,* 1967, 260 Iowa 859, 151 N.W.2d 477; *Lieberman v. W. M. Gulliksen Mfg. Co.,* 1955, 332 Mass. 439, 442–43, 125 N.E.2d 396, 398.

**48.** This occurred in at least two California decisions. *Silvera v. Broadway Department Store, Inc.,* S.D.Cal.1940, 35 F.Supp. 625, 626; *Arata v. Tonegato,* 1957, 152 Cal.App.2d 837, 314 P.2d 130, 132–33.

**49.** Uniform Commercial Code § 2–607, Comment 4.

In arguing that these requirements have been complied with, Eastern cannot rely on the same minimal standards of notice developed for ordinary consumers. The measure of good faith required under the Code varies with a buyer's commercial status. Unlike an ordinary purchaser, a merchant's[50] good faith is measured by "reasonable commercial standards of fair dealing in the trade."[51] Therefore, as the Comments to section 2–607 indicate, what constitutes adequate notice from an inexperienced consumer may not be sufficient in a transaction between professionals.[52] While an ordinary purchaser is generally ignorant of his obligation to give timely notice,[53] a merchant buyer should be well aware that some form of notice is a requirement of his trade. We find merit, then, in those decisions which have indicated that, under section 2–607, merchants will be held to a higher standard than ordinary buyers. *Nugent v. Popular Markets, Inc.*, 1967, 353 Mass. 45, 59, 228 N.E.2d 91, 94; *Ford v. Barnard, Sumner & Putnam Co.*, Mass.App., 1973, 294 N.E.2d 467, 469; *see* Note, Notice of Breach and the Uniform Commercial Code, 25 U.Fla.L.Rev. 520, 536–38 (1973).

We note, moreover, that the trial judge's rationale for ruling against McDonnell on the notice issue appears to have been based on a single letter written by Douglas in response to Eastern's March 15, 1966 request for aid in reducing its "pre-inauguration activities." In his post-trial memorandum, the District Judge appeared to infer a waiver of Douglas' right to notification concerning any future breaches from its request that this aid be postponed. In our view, though, the March 15 letter from Eastern does not constitute adequate notice as a matter of law. Indeed, a close reading of the communication reveals that Eastern's primary concern was the lack of early notification of impending delivery delays rather than the validity of Douglas' contention that these delays were the product of the Vietnam War. Although Eastern expressed the view that some of the delays should have been avoided, it requested merely that Douglas help to mitigate the delays' impact upon Eastern's operations. A jury, therefore, might reasonably infer from this correspondence that Eastern was not claiming a breach of the particular contract involved.[54]

More importantly, the District Court's reliance on these two particular letters evidences a failure to recognize that the buyer's good faith is the governing criterion under section 2–607. As we have seen, the Code's draftsmen disposed of rigid technical requirements which would frustrate the notice requirement's design of de-

---

**50.** Section 2–104(1) defines "merchant" as "a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction . . . ." Comment No. 2 to this section provides that

"[t]he term 'merchant' as defined here roots in the 'law merchant' concept of a professional in business. The professional status under the definition may be based upon specialized knowledge as to the goods, specialized knowledge as to business practices, or specialized knowledge as to both . . . ."

**51.** Section 2–103(1)(b) reads as follows: " 'Good faith' in the case of a merchant means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade."

**52.** Although the following statement concerns the time in which notification must be given, we consider it equally applicable to the issue of the content of adequate notice under section 2–607:

The time of notification is to be determined by applying commercial standards to a merchant buyer. "A reasonable time" for notification from a retail consumer is to be judged by different standards . . . .

Uniform Commercial Code § 2–607, Comment 4.

**53.** *See Greenman v. Yuba Power Products, Inc.*, 1962, 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897, 900 (Traynor, J.); Prosser, The Assault upon the Citadel (Strict Liability to the Consumer), 69 Yale L.J. 1099, 1130 (1960); Note, Notice of Breach and the Uniform Commercial Code, 25 U.Fla.L.Rev. 520, 536–38 (1973).

**54.** The exchange of letters relied on by the trial judge was concerned exclusively with delays arising under Contract 65–41–L which, as we have seen, cannot be the subject of an action by Eastern. See Part II *supra*.

feating commercial bad faith.[55] Therefore, the fact that dissatisfaction may once have been communicated to the seller should not preclude an inquiry into the buyer's good faith as evidenced by his entire course of conduct. *See United States v. Crawford, supra,* 443 F.2d at 614. Even though adequate notice may have been given at one point in the transaction, subsequent actions by the buyer may have dissipated its effect. The buyer's conduct, then, taken as a whole, must constitute timely notification that the transaction is claimed to involve a breach.[56]

It is particularly important in continuing contractual relationships—such as the one which bound Eastern and McDonnell Douglas together for almost four years—that all of a buyer's dealings with a seller be evaluated under the good faith standard. An overly mechanical application of the notice requirement to complex or ongoing agreements would frequently frustrate the section 2–607 design of defeating commercial bad faith.

Reviewing Eastern's entire course of conduct during the years 1965–1969, and recognizing that Eastern must be held to a higher standard of good faith than an ordinary consumer, we conclude that a jury could reasonably find, as one of its options, that adequate notice was not given. In analyzing the record before us, we are guided by the *Boeing Company v. Shipman, supra,* requirement that we give McDonnell the benefit of every reasonable inference.

We note first that even Eastern's most strongly worded communications can reasonably be construed as an effort to prod McDonnell Douglas into minimizing the Vietnam War's impact upon production rather than as a claim for breach. As we have seen, Eastern's March 15, 1966 letter to Douglas—perhaps its single most forceful expression of dissatisfaction—can be viewed as a request for aid in minimizing the impact of the delays rather than an assertion that Douglas had violated the contract.

Eastern, moreover, did not dispute McDonnell Douglas' contention that the delays were caused by the Vietnam War until the airline presented its formal claim for damages in 1969. Indeed, throughout the life of all the contracts, Eastern was advising its shareholders,[57] the public,[58] and, in sworn testimony, the Federal Government,[59] that war-related defense priorities were causing the delivery delays. Inasmuch as the "excusable delay" clause found in all the contracts provides that the "[s]eller shall not be . . . deemed to be in default" on account of delays caused by "governmental priorities," Eastern may well have led McDonnell to believe that it was not in breach of the agreements.

We disagree with Eastern's contention that it "had no choice but to accept what Douglas was saying as the truth." Eastern was in constant communication with its own engineer who was in residence at the

---

**55.** Indeed, the Code focuses so heavily on the buyer's conduct that notice is deemed given merely if the notifying party has taken reasonable steps to give the requisite notice to his counterpart. Uniform Commercial Code § 1–201(26) [Cal.Comm.Code § 1201(26)]. Thus, if a reasonable effort has been made by the buyer, it is not necessary that the seller actually learn of the breach for a buyer's rights to be preserved under section 2–607. *Smith v. Butler,* 1973, 19 Md.App. 467, 311 A.2d 813, 817.

**56.** We emphasize that even though a buyer's notification under this test may be adequate in terms of content, it may nonetheless be untimely. *See* Uniform Commercial Code § 2–607 Comment 4. The jury could have found, for example, that Eastern had given timely notice with regard to only some of the delivery delays.

**57.** Eastern's 1966 Annual Report, for example, stated that the aircraft deliveries were being delayed because of "the war demands on the aerospace industry and its suppliers."

**58.** On March 2, 1966, an Eastern press release stated that its "ability to increase available seat miles . . . is being restricted by the slow rate of the new aircraft deliveries by both Boeing and Douglas caused by the military requirements in Viet Nam."

**59.** Before the Civil Aeronautics Board, on December 8, 1967, Eastern stated that "Eastern, like other purchasers, has experienced substantial delays in delivery of DC–9–31 aircraft, largely because of military requirements for the Vietnam conflict."

Douglas plant throughout this period.[60] Furthermore, Eastern and, indeed, the entire aviation industry were aware that Douglas' catastrophic financial crisis was, to some degree, precipitated by internal management difficulties.[61] As early as the summer of 1966, therefore, Eastern had ample opportunity to assert then, as it does now, that the delivery delays were caused by internal problems rather than the Vietnam War. It failed to do so.

Eastern's commercial good faith is subject to further challenge because it continued to negotiate new contracts and amend old ones throughout the period in which the delays occurred. Two of the agreements, in fact, were executed in October of 1967 after 44 of the planes were already late. At no time during the negotiation and execution of any of these contracts did Eastern seek a settlement of its claims or even dispute McDonnell's Vietnam excuse. This may very well have led McDonnell to believe that, even though Eastern was unhappy about the delays, it did not consider them to be a breach of the contract.[62]

In addition to supporting the inference that adequate notice was not given, the record reveals a conflict in the evidence which, under *Boeing Company v. Shipman,*

*supra,* is sufficiently substantial to preclude a directed verdict for Eastern. As we have seen, both Mr. McDonnell and Mr. McGowan testified that Eastern's management had assured them that no damages would be sought because of the delivery delays. Eastern's witnesses disputed this contention. If such assurances were in fact given, Eastern's conduct may well have violated the requirements of commercial good faith. This conflict alone, then, is sufficient to render the question of notice an issue for the jury.

The evidence reflected in the record, however, is also insufficient to support a directed verdict in favor of McDonnell Douglas on the issue of notice. There was no evidence at trial concerning the "reasonable standards of fair dealing" in the commercial aviation industry. We, therefore, cannot determine whether Eastern's conduct failed to satisfy contemporary standards of commercial good faith. Additionally, the conflict in evidence described above, the testimony that Eastern in several instances refused to waive its legal rights,[63] and the dissatisfaction with the delays evident in several of the airline's communications with McDonnell, are sufficient to create a jury question. In conclusion, therefore, the issue

**60.** At oral argument, in fact, Eastern's counsel stated that the airline's representative at the Douglas plant "had a better estimate of when the planes were coming out than Douglas did."

**61.** Counsel for Eastern conceded as much in oral argument. When questioned by the court concerning when the airline first became aware of Douglas' internal problems, Eastern's counsel stated that by the summer of 1966 both Eastern and the general public "became aware of what the problems were inside of Douglas."

**62.** We recognize, of course, that once an airline begins to build a fleet with a particular make of airplane it cannot easily switch to a competing manufacturer. Eastern, therefore, is correct in pointing out that as of 1965, it was effectively "married" to Douglas. The conjugal nature of its relationship with Douglas, however, did not relieve Eastern of its obligation of commercial good faith. As we have seen, the notice requirement reconciles the seller's right to early warning of claims for breach with the need to accommodate the buyer who, for reasons of necessity, has to accept a tender which is not in full compliance with the contract. In a contin-

uing contractual relationship, therefore, the buyer must decide whether the benefits of claiming a breach of contract outweigh the need for a close rapport with the seller.

**63.** McDonnell also contends that the District Judge erred in ruling against and not submitting to the jury its contentions that Eastern had waived its claims and was otherwise estopped from pursuing this cause of action. Because they parallel McDonnell's contentions under section 2–607 and are based on the same evidence, the defenses of waiver and estoppel will be effectively decided by the jury's determination of the notice issue. *See* note 42 *supra.* Our holding concerning section 2–607, therefore, obviates the need for any separate consideration of these contentions. However, because we find no reasonable support in the record for McDonnell's contention that Eastern executed an accord and satisfaction with it, we do conclude that the District Judge correctly ruled against McDonnell on this particular issue.

of notice under U.C.C. § 2–607 should have been submitted to the jury with instructions that it determine whether Eastern's conduct throughout the life of the contracts constituted adequate and timely notice to McDonnell that it was considered to be in breach of the contracts.

### IV. *The Vietnam War as an Excuse for Delayed Deliveries*

Much of the trial below was devoted to McDonnell's defense that the delivery delays were the result of the escalation of the war in Vietnam and were therefore excusable under the contracts, the Defense Production Act, and the Uniform Commercial Code. To prove this contention, McDonnell introduced evidence of government pressure on its suppliers and subcontractors to accord military orders priority over civilian projects. McDonnell asserts that its efforts to raise the defense of government "jawboning" was frustrated by the trial judge's ruling and subsequent instructions to the jury which held that the only excusable delays were those resulting from formal ratings and directives issued in strict compliance with the Defense Production Act. Issue is also taken by McDonnell with the lower court's rulings that it had the burden of proof in establishing its defenses, that the U.C.C. is not applicable to this question and that any excusing event must have been unforeseeable.

Because we find that the Government's "jawboning" policy in effect during the years 1966–1969 comes within the terms of the contracts' excusable delay clause and the exculpatory provision of the Defense Production Act, we hold that the District Judge committed reversible error on this issue. The jury should have been instructed that McDonnell was not liable for any delays proximately caused by this government policy. The trial judge also erred in instructing the jury both that these particular delays had to have been unforeseeable and that the Code's impracticability defense was not available to McDonnell.

### A. *The Government's "Jawboning" Policy*

■ Although the origins of American involvement in Vietnam can be traced back to World War II, direct military intervention did not begin on a significant scale until after the overthrow of the Diem Regime in November of 1963. During the ensuing year, the United States increased the number of its troops stationed in that country from 1,000 to 20,300. This American commitment, however, constituted a relatively insignificant part of our total military budget and had no substantial effect on the national economy.[64] Even after the Gulf of Tonkin Resolution of August 2, 1964, our troop commitment in Vietnam remained stable with the total size of the army, in fact, declining. The massive American buildup did not begin in earnest until January of 1965,[65] and it was not until mid-1966 that the United States assumed the bulk of the combat role in Vietnam.

Thus, in February 1965, when Eastern and Douglas signed the letter of intent concerning all the agreements ultimately executed between them, the Vietnam conflict was having no significant effect on the American economy. There was, moreover, little indication at that time of the proportions which the war was quickly to assume.[66]

| Date | Number of troops |
|------|------------------|
| December 31, 1964 | 23,000 |
| June 30, 1965 | 103,000 |
| December 31, 1965 | 184,000 |
| June 30, 1966 | 322,000 |
| December 31, 1966 | 455,000 |

**64.** One expert witness testified that, prior to the fiscal year ending in 1966, the Vietnam conflict imposed no more than $100 million a year in "additional costs" on the military budget. This is a relatively insignificant factor in a $50 billion military budget or a $700 billion economy.

**65.** The bombing of North Vietnam did not officially begin until February 1966. As is indicated below, the number of American troops in Vietnam increased by 800 per cent during 1965:

**66.** For example, Secretary of Defense McNamara announced in 1965 that "We have stopped losing the war." At the time, President Johnson estimated that the military budg-

It was not until 1966 that the war first began to have a substantial impact on the American economy. During that year, for example, the armed forces absorbed over two-fifths of the nation's available manpower. A substantial share of the remaining available work force was taken by firms confronted with a rising backlog of defense-related orders. As one expert testified at trial, this military buildup was

> superimposed on an economy which was rapidly approaching full employment. . . . Hence there wasn't the available capacity in the American economy to absorb the Vietnam requirements on top of existing civilian requirements.

This, of course, led to conflicts between already scheduled commercial production and sudden, unexpectedly-large military needs. Rather than abandoning entirely the "guns and butter" policy upon which the war had been predicated, the Government sought instead to have military suppliers accord first priority to war production.

The vehicle by which military orders gained precedence over civilian production was the Defense Production Act of 1950 ("D.P.A."). 50 App.U.S.C. § 2061 *et seq.*[67] Section 101 of the D.P.A. grants the President broad authority to require that priority be given to "contracts or orders . . which he deems necessary or appropriate to promote the national defense."[68] Under section 704, the President is authorized further to "make such rules, regulations, and

---

et for the fiscal year ending in 1965 would be lower than that of the previous year. As late as 1966, American fiscal policy was being formulated on the assumption that the war would be over by June 1967. In March of that year, therefore, Secretary of the Treasury Fowler publicly expressed the hope that "no one will base his economic decisions on the purely speculative assumption that our Vietnam needs will exceed current expectations." The cost of the war in the fiscal year ending in 1967, however, exceeded the Government's estimates by almost 100 per cent.

67. ·The Defense Production Act has recently been amended. Defense Production Act Amendments of 1975, Pub.L. No. 94–152. 89 Stat. 810 (1975). Although the D.P.A. was changed in some significant respects, those provisions directly relevant to this appeal were unaffected. *See* S.Rep. No. 353, 94th Cong., 1st Sess. (1975). H.R.Conf.Rep. No. 673, 94th Cong., 1st Sess. (1975). Excerpts of the legislative history of the 1975 amendments are provided at 1975 U.S.Code Cong. & Admin.News p. 1588.

68. In full, section 101(a) reads as follows:
The President is authorized (1) to require that performance under contracts or orders (other than contracts of employment) which he deems necessary or appropriate to promote the national defense shall take priority over performance under any other contract or order, and, for the purpose of assuring . such priority, to require acceptance and performance of such contracts or orders in preference to other contracts or orders by any person he finds to be capable of their performance, and (2) to allocate materials and facilities in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense.
50 App.U.S.C. § 2071.
The broad latitude given the President in this area can also be inferred from the declaration of policy found in section 2:
The United States is determined to develop and maintain . . . military and economic strength . . .. Under present circumstances, this task requires diversion of certain materials and facilities from civilian use to military and related purposes. It requires expansion of productive facilities beyond the levels needed to meet the civilian demand. In order that this diversion and expansion may proceed at once, and that the national economy may be maintained with the maximum effectiveness and the least hardship, normal civilian production and purchases must be curtailed and redirected.
It is the objective of this Act . . . to provide the President with authority to accomplish these adjustments in the operation of the economy. It is the intention of the Congress that the President shall use the powers conferred by this Act . . . to promote the national defense, by meeting, promptly and effectively, the requirements of military programs in support of our national security and foreign policy objectives, and by preventing undue strains and dislocations upon wages, prices, and production or distribution of materials for civilian use, within the framework as far as practicable, of the American system of competitive enterprise.
50 App.U.S.C. § 2062.

orders as he deems necessary or appropriate to carry out the provisions of this Act." [69]

As provided under the D.P.A.,[70] the President in 1953 delegated his priority powers to the Director of what was then the Office of Emergency Planning ("O.E.P."), a part of the Executive Office of the President.[71] Pursuant to this delegation, the O.E.P., in turn, delegated priority authority over the air transport and other industries to the Secretary of Commerce. Within the Commerce Department, the Business and Defense Services Administration ("B.D.S.A.") was charged with administering the Defense Production Act.[72]

Pursuant to these delegations, the B.D.S.A. adopted rules and regulations governing the precedence to be given certain civilian and military orders.[73] The highest priority under these regulations was achieved by "directives" issued by the B.D.S.A. or the Office of Emergency Preparedness to schedule production at a particular plant.[74] "DX" ratings were intended to be used "to obtain products and materials in cases of extreme urgency," [75] and were accorded precedence over "DO"-rated orders which,

in turn, had priority over all unrated goods in a particular area of production.[76]

Because of its importance both to the economy and to national defense, production for civil air carriers, ever since the Korean War, had been accorded the same general "DO" priority rating given military aircraft. By having equal preferential status with military production, the manufacturers of commercial planes were guaranteed prior access to the hardware and vital raw materials also being sought by less essential industries.

Occasionally, "DO"-rated civilian orders would delay military requirements with the same priority rating. Prior to 1966, these conflicts were usually resolved by a Defense Department application to the B.D.S.A. for a "bottleneck-breaking DX rating." After a number of weeks, the B.D.S.A. would issue the requested rating if it determined that civilian orders were in fact delaying military production.

By the end of 1965, however, the enormous increase in urgent military orders had made this process so unwieldy that the Defense Department sought to have the "DO"

---

**69.** In relevant part, section 704 provides:

The President may make such rules, regulations, and orders as he deems necessary or appropriate to carry out the provisions of this Act . . .. Any regulation or order under this Act . . . may be established in such form and manner, may contain such classifications and differentiations, and may provide for such adjustments and reasonable exceptions as in the judgment of the President are necessary or proper to effectuate the purposes of this Act . . ., or to prevent circumvention or evasion, or to facilitate enforcement of this Act . . ., or any rule, regulation, or order issued under this Act . . . ..

50 App.U.S.C. § 2154.
Section 103 imposes criminal sanctions for the violation of "any rule, regulation or order" issued under the Defense Production Act. 50 App.U.S.C. § 2073.

**70.** Under section 703,

"the President may delegate any power or authority conferred upon him by this Act . . . to any officer or agency of the Government, including any new agency or agencies (and the President is authorized to create such new agencies . . . as he

deems necessary), and he may authorize such redelegations by that officer or agency as the President may deem appropriate." 50 App.U.S.C. § 2153.

**71.** Exec. Order No. 10480, 18 Fed.Reg. 4939 (1953).

**72.** 18 Fed.Reg. 6503 (1953).

**73.** Reg. 2, Basic Rules of the Priorities System, 18 Fed.Reg. 1684 (1953), as adopted by the B.D.S.A., 18 Fed.Reg. 6503 (1953). Although Regulation 2 was initially promulgated under the National Production Authority (NPA), the B.D.S.A.'s predecessor in the Commerce Department, Exec. Order No. 10161, 15 Fed.Reg. 6105 (1950), the provision was specifically continued in force when B.D.S.A. was created. 18 Fed.Reg. 6503, 6505 (1953).

**74.** See Reg. 2, § 16, 18 Fed.Reg. 1684 (1953).

**75.** Reg. 2, § 3(a)(2), 18 Fed.Reg. 1684 (1953).

**76.** Reg. 2, §§ 3(b)(1) & (2), 18 Fed.Reg. 1684 (1953). Reg. 2 also provides that all DO-rated orders have equal preferential status. Reg. 2, § 3(b)(2).

rating removed from commercial aircraft production.[77] This request alarmed the entire aviation industry because it would have severely impeded its access to scarce raw materials and the heavy industry which was then processing these materials at full capacity. The airlines themselves were concerned that the loss of "DO" priority would further slow the production of planes already being delayed by a war-caused shortage of jet engines, and that non-urgent military orders would be filled at the expense of pressing commercial needs.

In the face of this widespread opposition, the military withdrew its request that the "DO" rating be removed from commercial aircraft production. As a *quid pro quo*, however, the Defense Department insisted that particular military orders be given preference on an individual and informal basis. It appears that the aviation industry agreed to the proposed arrangement.[78] Official recognition of the new policy is found in a July 22, 1966 letter from Farris Bryant, Director of the Office of Emergency Plan-

ning, to the Assistant Secretary of Defense, Paul R. Ignatius:

> It is my understanding that, by voluntary agreement between the Department of Defense and the aircraft manufacturers, actions have been taken which permit the manufacturers to produce military orders ahead of all civil air-carrier aircraft although both have equal priority rating.

> If this policy has resulted in deliveries which are satisfactory to your Department, it should continue. However, to insure its performance, I am requesting the Secretary of Commerce to use his directive authority wherever necessary to guarantee delivery of military aircraft and associated equipment.[79]

That same day a copy of this letter was forwarded to the Secretary of Commerce, John T. Conner, with a request that he instruct the B.D.S.A. "to take all necessary actions to insure the prompt delivery of military aircraft." The Secretary of Commerce replied on July 27, 1966, stating that

**77.** Between 1965 and 1966, the number of Defense Department requests for DX ratings increased from 1,172 to 5,212.

**78.** William N. Lawrence, the official in charge of the priorities office within the Office of Emergency Planning during the period at issue, testified that the aircraft manufacturers "voluntarily" agreed to the Defense Department's proposal. An executive of Pratt & Whitney, the sole suppliers of jet engines to Douglas, testified that the aircraft industry acceded to a system of "voluntary compliance" in order "to prevent the removal of the ["DO"] priority rating from commercial [production]." Even representatives of the airlines themselves acknowledged as early as July 1966 that "there are informal means by which the military orders can be given priority at the factory." "Staff Study" at 6, attached to letter to William N. Lawrence from F. E. Brown, Director of Supplies, Air Transport Association of America, July 14, 1966.

**79.** The evidence establishes that the Bryant letter was approving, after the fact, a policy which the B.D.S.A. had been pursuing for some time. *See* note 80 *infra*. This letter was excluded from evidence because the trial judge considered Mr. Bryant's "understanding" that a voluntary agreement had taken place to be hearsay. Tr. 2362–2372. It should be noted,

however, that the District Court relied on this same letter in his denial of McDonnell's motion for a new trial. District Court's Order Granting in Part Defendant's Motion for Judgment Notwithstanding the Verdict and Denying Defendant's Motion for a New Trial, March 26, 1974. Regardless of whether the letter would otherwise be excludable as hearsay, *see* Fed.R. Evid., Rule 803(8), 28 U.S.C., it should have been admitted because it does establish that the official to whom the President had delegated all his powers under the D.P.A. approved of the informal "jawboning" at issue in this case.

In the 1966 annual report of the Department of Commerce to the Joint Committee on Defense Production, the congressional group charged with overseeing the D.P.A., 50 App.U. S.C. § 2162, the Department noted that "many successful actions taken by BDSA to expedite defense deliveries were accomplished without formal action." This report was included in the Sixteenth Annual Report of the Activities of the Joint Committee on Defense Production, H.R.Rep. No. 1, 90th Cong., 1st Sess. 174 (1967). The District Court excluded the above-quoted sentence from evidence, Tr. 7446. This statement is clearly admissible as being part of a public agency's report "setting forth . . . the activities of the office or agency." Fed.R. Evid., Rule 803(8), 28 U.S.C.

With regard to the limitations imposed on the use of priorities, I have directed the Business and Defense Services Administration to take all necessary actions to insure the appropriate administration of the priorities activities in accordance with the policies outlined in your letters to Mr. Ignatius and to us.

Mr. Bryant's letters to Ignatius and Conner were disseminated among the manufacturers and suppliers in the aviation industry, and the policy outlined in them became public knowledge.

That "jawboning" of aircraft manufacturers continued to be the policy of the Executive Branch throughout the period at issue in this case is evident in an August 1, 1969 letter from the Acting Secretary of Commerce, Rocco C. Siciliano, to General G. A. Lincoln, Director of the Office of Emergency Preparedness, which was the successor to the Office of Emergency Planning. In reply to Lincoln's inquiry concerning the aviation industry's request for an extension of its "DO" priority rating, Siciliano noted that his Department had no objection and stated:

> It is recommended that any extension of the provisions of the July 22, 1966 letter from the Director of OEP [Bryant] to the Assistant Secretary of Defense [Ignatius] be for a period coterminous with any extension of the Defense Production Act of 1950, as amended; that it be subject to continuing arrangements that will assure deliveries of military needs in advance of civil orders; and that it be subject to termination by the Director of OEP at any time.

As explained by William J. Zepp, the Commerce Department official in charge of the B.D.S.A., the policy approved by Mr. Bryant was that when "DO"-rated orders conflicted, the military came first."[80] Individual firms, moreover, were told that any resistance to informal requests by representatives of the military would result in a formal directive being issued against

---

**80.** The statement, along with the colloquy in which it appeared, was stricken by the District Court:

Q. Let me ask you this, sir. As a result of your receipt of the letters that you have just been shown, was there any different policy followed by your office as priorities officer and executive secretary of the Business and Defense Services Administration regarding DOA1 ratings of military planes and commercial planes in handling special assistance cases?

Q. You may answer.
A. Those letters more or less reflected existing policy.

Q. Now, Mr. Zepp, you said on the last question, sir, that—I believe you said that the effect of these letters was already existing Government policy, am I correct in that? Or you put it in your words.
A. Reaffirmation of existing policy.
Q. Reaffirmation of existing policy. Mr. Zepp, my question to you is: When you had, or were there instances where you had a situation where commercial aircraft, DO rated orders, and military aircraft DO rated orders conflicted, what policy, sir, had been followed by you preexisting these letters?

A. Yes. The policy was that the military came first. This is a reflection of the Defense Production Act and the way the President's powers were to be used by our office.
Q. Is that the policy you, as top priorities officer in the Department of Commerce, exercised?
A. It was. I am referring to Section 101 of the Act.

The District Court also struck the following exchange during Eastern's cross-examination of Mr. Zepp.

Q. Can you tell this jury, where you have a situation where a commercial DO rated order and a military order—DO order— were received by a supplier relating to the same identical order, engines, or whatever, how would it be handled by the supplier?
A. He would have to work on the military order first.

The trial judge struck this testimony pursuant to his holding that only delays caused by formal ratings are excusable. Since we hold this to be an erroneous interpretation of the contracts and the Defense Production Act, all evidence of this sort should be presented for the jury's consideration upon the retrial of this case.

them.[81] For example, Pratt & Whitney, the sole supplier of engines to Douglas, was "overwhelmed" in 1966 by government demands that its production of military engines be accelerated.[82] These requests were being acceded to, in the words of one Pratt & Whitney executive, "to prevent the removal of the priority rating from the commercial [orders]."

Similar pressures were being applied to the manufacturers of Douglas' landing gear. Gerald Lynch, President and Chairman of Menasco, Inc., testified that the underlying reason for his firm's delay in delivering landing gear to Douglas was "the extraordinary unanticipated requirements for . . . military spares." When questioned by Eastern's counsel concerning why Menasco gave the military priority over Douglas, Lynch replied that

> the Douglas program was the most important program in the house. There is no question about that, and it was. After all, Douglas is a continuing customer,

---

**81.** William N. Lawrence, the official charged with administering the O.E.P.'s priorities program, gave the following testimony:

> Q. And when you say "jawboning," sir, what do you refer to?
>
> A. I refer there to where a telephone call is used rather than a formal directive to expedite delivery of a particular item from a particular plant.
>
> Q. And you say the telephone call is used, the jawboning, in a sense, if it is not done a priority would be directed?
>
> A. A directive would be issued.

In a letter dated July 12, 1966, Major General C. W. Cecil of the Air Force wrote to Douglas urging compliance with the priorities policy of the Government, noting that "[a]s you are undoubtedly aware, production under [military] contracts assigned a priority rating will take precedence over unrated or civilian orders." The trial judge again erroneously refused to admit this evidence of informal government pressures.

**82.** The nature and extent of these demands are revealed in a letter from Lieutenant General Gerrity of the Air Force to Pratt & Whitney dated December 23, 1966. General Gerrity reaffirmed his position that

> the Air Force is not "standing in line" to receive . . . engines on any schedule short of our established requirements. . . . [W]hile I'm completely sympathetic to your overall problem of attaining increased capacity to meet both commercial and military schedules, I must re-emphasize that if you cannot meet both, then the priority should go to our military engines.

This evidence was stricken by the trial judge. Eastern contends that Gerrity's evidence was properly excluded because the General could not himself issue a "DX" rating, and therefore could not have overridden the commercial, "DO"-rated orders. This is not entirely clear, however. Gerrity was Air Force Deputy Chief of Staff, Systems and Logistics, as well as Administrative Head of the Joint Aeronautical Materials Activity Command. The Commerce Department's report on the activities of the B.D.S.A. during 1966 includes as an exhibit a Defense Department presentation given throughout the nation to firms having defense contracts. The opening paragraph of this presentation states that each of the armed services had the right to apply "DX" priority to their orders:

> [T]he Business and Defense Services Administration has delegated to the Secretary of Defense and the Chairman of the Atomic Energy Commission, three main priorities and allocations authorities; namely, to rate their contracts and orders with DX or DO; to assign the right to apply the DX or DO ratings for capital equipment; and to allocate steel, copper, aluminum and nickel alloys for their A products. The Secretary of Defense has delegated these powers to the Assistant Secretary of Defense for Installations and Logistics. These powers, in turn, have been delegated . . . to the Army, Navy, Air Force. . . .

H.R.Rep. No. 1, 90th Cong., 1st Sess., 192–93 (1967).

This description of the delegation of authority under the D.P.A. is supported by testimony of William N. Lawrence. Moreover, Major General Cecil of the Air Force wrote to Douglas on July 12, 1966, that both "DO" and "DX" ratings were "assigned by the procuring authority [*i. e.* the Air Force]."

Mr. Zepp's testimony, though, would seem to indicate that only the B.D.S.A. had authority to issue a "DX" rating. However, even assuming that General Gerrity did not himself have authority to issue the required rating, there is no doubt that a request from him to the B.D.S.A. would have achieved the same result. As Zepp testified, the B.D.S.A.'s procedure merely determined whether or not the Defense Department's claim of delay was accurate. Because Zepp and the B.D.S.A. subscribed to the "military first" policy, it would have been futile for affected firms to resist the informal jawboning. Consequently, the Gerrity letter should have been admitted as evidence of the government pressures placed on defense suppliers to grant military requirements over other "DO"-rated orders.

would have been a continuing customer through 1972 or '73.

It was to our economic interest to meet the Douglas requirement first and all other requirements second. However, as I pointed out, we were under the power of what I construed to be higher priority items, as far as the military were concerned. I couldn't commit capacity to Douglas ahead, if you will, of military projects. . . . There was just no way for us to do it, as I read the Defense Production Act and the orders.

I am familiar with the Defense Production Act. I was in Washington when the Act was developed. I was there throughout the entire Korean War, and I understood fully the significance of a military order.

There was no question in my mind then, nor is there any question in my mind now, that a military order had preference over any commercial order in the house. Even though it was not to Menasco's economic interest to place military orders ahead of commercial orders, I knew that.

Mr. Kimbrell, you have to understand that we do business with the military on kind of a casual, desultory basis. We do business with the military on spares when they need spares. But the continuing viability of our company depends upon our ability to meet the requirements of the prime contractors, which are Douglas, Lockheed, Grumman, Boeing and the rest of them. . . . [T]here is an overriding consideration that must be acknowledged, and that was the prior treatment that in my opinion, and I think in the opinion of the entire industry, we had to give military orders preferential consideration.

Cleveland Pneumatic Tool Company, the other supplier of landing gear to Douglas also gave military orders priority despite the "DO" rating given its civilian contracts. In response to McDonnell Douglas complaints concerning the delays, the firm sent a telegram on February 2, 1968 stating:

We are attempting to do everything possible to improve our schedule position. However, we are constantly reminded by the military that where commercial work and military work of equal priority conflict, industry has agreed that it will support the military requirement first. We believe that Douglas subscribed to this policy. We have no choice but to adhere to it.

Taking the view that the jawboning policy described above was voluntarily acquiesced in by the aviation industry, the District Court ruled and subsequently instructed the jury during the liability phase of the trial that only delays resulting from the actual issuance of formal ratings or directives could be deemed excusable.[83] Consistent with this approach, the trial judge either

---

**83.** The District Court's jury instructions on this issue were as follows:

I charge you that in order for McDonnell Douglas to establish that delivery delay was due to governmental priorities, allocation regulations or orders affecting materials, equipment, facilities or completed aircraft, McDonnell Douglas must show by the greater weight of the evidence:

1. That a government order had been actually assigned a DX rating by the Business and Defense Services Administration of the Department of Commerce or other appropriate government agency, or that a supplier had been issued a directive by the Business and Defense Services Administration to allocate a portion of its production to a government order rather than a commercial order, and

2. That a recipient actually complied with the DX rating or directive, and

3. That compliance with the DX rating or directive proximately caused delivery delays to Eastern airplanes which are the subject matter of this suit.

A voluntary preference given to a government order by McDonnell Douglas or one of McDonnell Douglas' subcontractors does not excuse any failure on defendant's part to deliver the aircraft on time.

. . . . .

I charge you that the only acts of government which you may consider as excusing factors under the excusable delay clause of the contracts are acts taken by government officials in the lawful exercise of their authority, including the acts of issuing DX ratings by the government agencies and directives by the Business and Defense Services Administration.

excluded or struck evidence concerning government jawboning of Douglas' suppliers.

In an effort to blunt McDonnell's attack on the trial judge's rulings and instructions, Eastern devoted a great deal of its briefs and oral argument to a recitation of purported management difficulties at Douglas during the years 1965–1966. Eastern implied that even if the District Court erred in its approach to the Government's jawboning policy, there are no grounds for reversal because the delivery delays were in fact the product of Douglas mismanagement rather than the Vietnam conflict.

Under the *Boeing Company v. Shipman* standard, however, there is ample evidence in the record to make this issue one for the jury. Not only does it appear that there was a substantial war-caused labor shortage in Douglas' recruiting area,[84] but Douglas' suppliers testified that their own delays were the product of similar labor shortages.[85] There is also direct evidence indicating that the delivery schedules of the manufacturers of Douglas landing gear[86] and engines[87] were delayed by the war. In short, the proof indicating that there were at least some war-caused delivery delays is not so inadequate as to eliminate the prejudicial effect of the trial court's rulings on military jawboning.[88] We turn, therefore, to an examination of the legal basis for those of the court's rulings and instructions

84. The California Department of Employment Research, for example, reported that

The coincidence of the upsurge in the demand for aircraft production workers and the accelerated hiring among firms affected by developments in Vietnam, caused a rapid spread of recruitment problems involving a wide variety of occupations. Because of the prolonged slump in aircraft production, the supply of experienced aircraft workers had long since been diverted into other industry occupations and areas. The renewed demand quickly exhausted the supply of qualified machine shop metal trades and related workers. As the supply diminished, hiring specifications eased until the point was reached where there was mass hiring of trainees. California Department of Employment Research and Statistics, Los Angeles Metropolitan Area, *Economic Background of Los Angeles County 21* (April, 1967).

85. The President and Chairman of Menasco, one of Douglas' landing gear suppliers, testified that his firm had to "beat the bushes" for skilled workers because of "the added volume that was unanticipated and was imposed by the Southeast Asian operation."

86. Menasco, for example, was four months late in its deliveries of landing gear during 1966. As Eastern's counsel noted at oral argument, McDonnell presented claims to Menasco and Cleveland Pneumatic and, in fact, has received an out-of-court settlement from Cleveland Pneumatic.

87. There is evidence that Douglas had to reschedule its production of DC–8 and DC–9 aircraft as a result of engine delivery delays. During this period, Pratt & Whitney expressly admitted to "delaying Douglas."

Although Eastern's counsel conceded in oral argument that Pratt & Whitney was late in delivering engines, he pointed to testimony of Arthur E. Smith, an executive of Pratt & Whitney, indicating that "by extraordinary effort," Douglas could get the engines installed out of their normal sequence on the assembly line without delaying delivery of the airplane. However, the record reveals that when Smith was asked directly whether the delivery of a Douglas plane to a customer was delayed by a lack of an engine, he replied: ....

What I am saying is that airplanes *that were ready to be delivered* were not delayed by lack of an engine. I think that is the proper context of what I am trying to get across.

A jury could infer from this testimony that, while aircraft already on the assembly line were not delayed by Pratt & Whitney, the manufacturing process could have been hindered at some earlier point by the engine delays.

88. Interestingly enough, Boeing announced in May of 1966 that the delivery of its 707 and 727 aircraft would be delayed for periods of thirty days until as late as 1969. The anticipated delays were attributed to "the increasing military requirements for [Pratt & Whitney] engines and engine parts." As the Chairman and President of Menasco testified, the entire aviation industry appeared to be experiencing similar problems:

I don't know of anybody in . . . the aircraft manufacturing business—starting out with machine tool builders and forging houses, to manufacturers—who were not impacted in about the same way and about the same degree.

to the jury which related to McDonnell's Vietnam War defense.

### B. The "Excusable Delay" Clause

McDonnell Douglas contends that the trial judge's instructions to the jury undercut the defense available to it under the excusable delay clause found in all of the contracts at issue in this appeal. In relevant part, the provision reads as follows:

> Seller shall not be responsible nor deemed to be in default on account of delays in performance . . . due to causes beyond Seller's control and not occasioned by its fault or negligence, including but not being limited to . . . any act of government, governmental priorities, allocation regulations or orders affecting materials, equipment, facilities or completed aircraft, . . . failure of vendors (due to causes similar to those within the scope of this clause) to perform their contracts . . . , provided such cause is beyond Seller's control.

### 1. Ejusdem Generis and the Applicability of U.C.C. § 2–615

McDonnell's first contention in this regard is that the District Court unduly narrowed the scope of this clause by instructing the jury that an excusable delay must be the result of "one or more of the listed events in the excusable delay clause of the contracts, or . . . a similar cause beyond the defendant's control. . . ." This instruction, in McDonnell's view, effectively construes the specifically listed excusable causes of delay as restricting the application of the more general phrase which exempts Douglas from liability for delays beyond its control and not due to its negligence. McDonnell feels, therefore, that its affirmative defense was unjustifi-

ably limited to delays caused by events similar to those specifically listed when, in fact, the contracts excused all delays which were not its fault.

The trial judge's construction of the clause, moreover, affords McDonnell Douglas a narrower range of excuses than is available under the modern view of impossibility as it is codified in U.C.C. § 2–615.[89] Simply stated, section 2–615 excuses delay or nondelivery when the agreed upon performance has been rendered "commercially impracticable" by an unforeseen supervening event not within the contemplation of the parties at the time the contract was entered into. Uniform Commercial Code § 2–615 [Cal.Comm.Code § 2615] Comments 1 & 8; see Restatement, Contracts §§ 454, 457 (1932); 6 A. Corbin, Contracts §§ 1321, 1339 (1962).

Under section 2–615, the impossibility defense is available to the seller only if he has not "assumed a greater obligation" than that imposed upon him by this provision. During the trial, the court below ruled that section 2–615 was not applicable for this reason. Although the trial judge failed to explain his holding, it must have been based upon his restrictive construction of the excusable delay clause. Presumably, then, the protections of section 2–615 were deemed to have been waived because the contracts were interpreted as limiting McDonnell's impossibility defense to delays caused by events similar to those specifically provided for in the excusable delay clause.

 In support of this approach, Eastern argues that the District Court correctly applied ejusdem generis, a canon of judicial construction limiting the application of general terms which follow specific ones to matters similar in kind or classifica-

**89.** In relevant part, section 2–615 reads as follows:

> *Excuse by Failure of Presupposed Conditions*
>
> Except so far as a seller may have assumed a greater obligation and subject to the preceding section on substituted performance:
> (a) Delay in delivery or non-delivery in whole or in part by a seller who complies with paragraphs (b) and (c) is not a breach

of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the non-occurrence of which was a basic assumption on which the contract was made or by compliance in good faith with any applicable foreign or domestic governmental regulation or order whether or not it later proves to be invalid.

tion to those specified. *See Bumpus v. United States,* 10 Cir., 1963, 325 F.2d 264, 266–67; *Ruth v. Pacific Gas & Electric Co.,* 1972, 23 Cal.App.3d 806, 819, 100 Cal.Rptr. 501, 509. This maxim, however, "is only an instrumentality for ascertaining the correct meaning of words when there is uncertainty." *Gooch v. United States,* 297 U.S. 124, 128, 56 S.Ct. 395, 397, 80 L.Ed. 522, 526 (1936); *accord, City of Los Angeles v. Superior Court,* 1934, 2 Cal.2d 138, 39 P.2d 401. Obviously, the application of the doctrine in this case would make superfluous the unambiguous words "including but not being limited to" which precede the specifically listed excuses for delay.[90] It is clear, then, that by excusing delays not within McDonnell's control nor due to its negligence, "in-cluding but not being limited to" governmental acts, priorities, or orders, the parties intended to excuse all delays coming within the general description regardless of their similarity to the listed excuses. Consequently, there is no basis for the trial judge's conclusion that McDonnell waived the protections of section 2–615 and that its contract excuses are narrower than those available under the doctrine of commercial impracticability.[91]

## 2. The Foreseeability Issue

McDonnell also challenges the trial judge's jury instruction which limited excusable delivery delays to those resulting from events which were not "reasonably foreseeable" at the time a contract was

---

**90.** *Ejusdem generis,* by its very terms, applies only where the general terms of an exculpatory clause follow a more specific listing of excused events. Here, of course, the general terms of the excusable delay clause precede the more specific provisions. Most decisions limiting the application of similar clauses can be distinguished on this basis as well. *See, e. g., Excelsior Motor Mfg. & Supply Co. v. Sound Equipment, Inc.,* 7 Cir., 1934, 73 F.2d 725, 728.

It is true, however, that, in one case, the United States Court of Claims limited an almost identical exculpatory provision to the specifically listed events despite words expressly stating that the general provision included but was not restricted to those events. *Austin Co. v. United States,* Ct.Cl., 1963, 314 F.2d 518, 520, 161 Ct.Cl. 76, *cert. denied,* 375 U.S. 830, 84 S.Ct. 75, 11 L.Ed.2d 62. In our view, this decision merits the criticism it has received from Professor Corbin:

The court interpreted the . . . "exculpatory clause" as not including the inherent "impossibility" as alleged by the plaintiff, since it was not *ejusdem generis* with the causes specifically listed. It does not comment on the words "but are not restricted to," words that in the opinion of this treatise prevent the *ejusdem generis* rule from being very clearly applicable.

6 A. Corbin, Contracts § 1328 n. 40 (1962, Supp.1964).

**91.** McDonnell Douglas argues that Eastern is precluded from maintaining this action because the contracts all lapsed under section 2–616, the U.C.C. provision which outlines the procedures to be taken when a seller justifies a breach under section 2–615. Section 2–616 reads as follows:

(1) Where the buyer receives notification of a material or indefinite delay or an alloca-tion justified under the preceding section he may by written notification to the seller as to any delivery concerned, and where the prospective deficiency substantially impairs the value of the whole contract under the provisions of this Article relating to breach of installment contracts (Section 2–612), then also as to the whole,

(a) terminate and thereby discharge any unexecuted portion of the contract; or

(b) modify the contract by agreeing to take his available quota in substitution.

(2) If after receipt of such notification from the seller the buyer fails so to modify the contract within a reasonable time not exceeding thirty days the contract lapses with respect to any deliveries affected.

(3) The provisions of this section may not be negated by agreement except in so far as the seller has assumed a greater obligation under the preceding section.

While it is true that Eastern failed to pursue the options available to it under section 2–616, both parties during the years 1966–1969 continued to perform as though the agreements remained in force without ever making reference to the Code procedures. Therefore, we cannot accept McDonnell's belated assertion that all the contracts were automatically terminated under section 2–616(2). A seller cannot employ this thirty-day termination provision to deprive an unwary buyer of his U.C.C. rights and remedies. Such an approach would frustrate section 2–616's purpose of protecting the buyer confronted with a claim of excuse under section 2–615. *See* Project, A Comparison of California Sales Law and Article Two of the Uniform Commercial Code (Part II), 11 U.C.L. A.L.Rev. 78, 104 (1963).

executed.[92] By writing a foreseeability requirement into the excusable delay clause, the District Court appeared to construe the contracts as constituting nothing more than an application of the Code's commercial impracticability rule to those particular events specified in the contracts.[93]

Although there has been some doubt expressed as to whether the Code permits parties to bargain for exemptions broader than those available under section 2–615, this concern is ill-founded. *See* Hawkland, The Energy Crisis and Section 2–615 of the Uniform Commercial Code, 79 Com.L.J. 75 (1974). Comment 8 to this provision plainly indicates that parties may "enlarge upon or supplant" section 2–615. *See United States v. Wegematic Corp.,* 2 Cir., 1966, 360 F.2d 674, 677 (Friendly, J.).

There appear to be, however, certain strictures imposed upon judicial interpretation of such agreements. Comment 8 provides:

Generally, express agreements as to exemptions designed to enlarge upon or supplant the provisions of this section are to be read in light of mercantile sense and reason, for this section itself sets up the commercial standard for normal and reasonable interpretation and provides a minimum beyond which agreement may not go.

While this provision could have been drafted in less vague terms, we presume that Comment 8 establishes "mercantile sense and reason" as a general standard governing our construction of agreements enlarging upon the protections of section 2–615.[94] As we understand Comment 8, where there is doubt concerning the parties' intention, exemption clauses should not be construed as broadening the excuses available under the Code's impracticability rule. Applying this standard to the excusable delay clause, we cannot, in the absence of evidence to the contrary, hold that McDonnell is exempt from liability for any delay, regardless of its foreseeability, that is due to causes beyond its control. Exculpatory provisions which are phrased merely in general terms have long been construed as excusing only unforeseen events which make performance impracticable. *Vernon Lumber Corp. v. Harcen Construction,* E.D.N.Y., 1945, 60 F.Supp. 555, 558, *aff'd on other grounds,* 2 Cir., 1946, 155 F.2d 348; *see Inter-Coast Steamship Co. v. Seaboard Transportation Co.,* 1 Cir., 1923, 291 F. 13, 18; 3A A. Corbin, Contracts § 642 (1960); 6 A. Corbin,

---

**92.** McDonnell contends further that the District Court erred in instructing the jury that it had the burden of proving excusable delay. The burden of proof in diversity cases is a substantive question which is controlled by state law. *Cities Service Oil Co. v. Dunlap,* 308 U.S. 208, 60 S.Ct. 201, 84 L.Ed. 96 (1939). As we have seen, the contracts provide that performance is to be determined according to California law. In California, a promisor seeking to be excused from performance has the burden of proving all the elements of his affirmative defense. *See Ocean Air Tradeways, Inc. v. Arkay Realty Corp.,* 9 Cir., 1973, 480 F.2d 1112, 1117; *Lloyd v. Murphy,* 1944, 25 Cal.2d 48, 54, 153 P.2d 47, 50–51. The excusable delay clause, moreover, cannot be viewed as shifting this burden to Eastern. *See* 3A A. Corbin, Contracts § 642 at 73 (1960). Consequently, the trial judge's burden of proof instructions were correct.

We do note, however, that the trial judge may have misled the jury by instructing it that McDonnell's defense would fail if the jury could not determine "what number of days of delay . . . was proximately caused by excusable factors." The court could more properly have informed the jury that McDonnell had to prove that a certain proportion of the delays were due to circumstances coming within the excusable delay clause without intimating that a particular day of delay had to be attributed to a specific excusing event.

**93.** The trial court's instructions on this issue were as follows:

In seeking to excuse its delayed performance on the theory that the delays were due to causes beyond its control and not occasioned by its fault or negligence, the defendant has the burden of proving that any excusing event or occurrence upon which it relies was not reasonably foreseeable at the time the contract was entered into.

**94.** Professor Hawkland's discussion of Professor Llewellyn's purposes in preparing the forerunner to section 2–615 and of the legislative history of this provision before the American Law Institute provides some insight into this question. *See* Hawkland, *supra,* at 77–79.

Contracts § 1342, at 409 (1962). Courts have often held, therefore, that if a promisor desires to broaden the protections available under the excuse doctrine he should provide for the excusing contingencies with particularity and not in general language. *See S. L. Jones & Co. v. Bond,* 1923, 191 Cal. 551, 217 P. 725; *Tomlinson v. Wander Seed & Bulb Co.,* 1960, 177 Cal.App.2d 462, 2 Cal.Rptr. 310; *Beatty v. Oakland Sheet Metal Supply Co.,* 1952, 111 Cal.App. 2d 53, 244 P.2d 25; Hawkland, *supra,* at 76, 79.

We realize, of course, that this rule of construction developed in the pre-U.C.C. era when the scope of the impossibility and frustration doctrines was unclear and varied from jurisdiction to jurisdiction. Because of the uncertainty surrounding the law of excuse, parties had good reason to resort to general contract provisions relieving the promisor of liability for breaches caused by events "beyond his control." Although the Uniform Commercial Code has ostensibly eliminated the need for such clauses, lawyers, either through an abundance of caution or by force of habit, continue to write them into contract. *See generally* Squillante & Congalton, Force Majeure, 80 Com.L.J. 4, 8–9 (1975). Thus, even though our interpretation would render the general terms of the excusable delay clause merely duplicative of section 2–615, we will adhere to the established rule of construction because it continues to reflect prevailing commercial practices.

■■■■■■ We reiterate, however, that we are applying only a canon of contract interpretation which generally reflects commercial standards of reasonableness. We disagree with the suggestion of one commentator that section 2–615 imposes a fixed standard governing the interpretation of exemption clauses.[95] The Code establishes no absolute requirement that any agreement purporting to enlarge upon section 2–615 must do so in plain and specific language. Even in the absence of detailed wording, trade usage and the circumstances surrounding a particular agreement may indicate that the parties intended to accord the seller an exemption broader than is available under the U.C.C.[96]

■■■■■■ While we hold that the provision of the excusable delay clause exempting McDonnell from liability for delays beyond its control should be interpreted as incorporating the Code's commercial impracticability doctrine, we disagree with the trial judge's jury instruction on foreseeability insofar as it implies that the events specifically listed in the excusable delay clause in each contract must have been unforeseeable at the time the agreement was executed. The rationale for the doctrine of impracticability is that the circumstance causing the breach has made performance so vitally different from what was anticipated that the contract cannot reasonably be thought to govern. 6 S. Williston, Contracts § 1963 at 5511 (rev. ed. 1938). However, because the purpose of a contract is to

**95.** Professor Hawkland suggests that Comment 8
would appear to have reference to the common law limitations on the enforceability of exemption clauses, namely that the excusing contingencies must be stated with particularity and not in general language, and that their occurrence actually must have prevented or delayed the seller's performance in spite of his reasonable efforts to perform. Hawkland, *supra,* at 79.

**96.** As Comment 8 indicates, however, there is a point beyond which any such agreement may not go. Professor Hawkland suggests that the "minimum" established by section 2–615 includes the duty of the seller to allocate deliver-

ies among his customers and to notify the buyer of any delivery delay or nondelivery. Hawkland, *supra,* at 79. One student commentator, though, appears to construe Comment 8 as limiting the degree to which a seller's protections under section 2–615 can be narrowed. Note, UCC § 2–615: Sharp Inflationary Increases in Cost as Excuse from Performance of Contract, 50 Notre Dame Law. 297, 300–301 (1974). In any event, exemption provisions are limited by those sections of the Code prohibiting agreements which are "manifestly unreasonable" [§ 1–102(3)], in bad faith [§ 1–203], or unconscionable [§ 2–302]. *See Transatlantic Financing Corp. .v. United States,* 1966, 124 U.S.App.D.C. 183, 363 F.2d 312, 315 n. 3.

place the reasonable risk of performance on the promisor, he is presumed, in the absence of evidence to the contrary, to have agreed to bear any loss occasioned by an event which was foreseeable at the time of contracting. *Lloyd v. Murphy,* 1944, 25 Cal.2d 48, 54, 153 P.2d 47, 50 (Traynor, J.); *see Madeirense Do Brasil S.A. v. Stulman-Emrick Lumber Co.,* 2 Cir., 1945, 147 F.2d 399, 403; *McCulloch v. Liguori,* 1948, 88 Cal. App.2d 366, 373, 199 P.2d 25, 30. Underlying this presumption is the view that a promisor can protect himself against foreseeable events by means of an express provision in the agreement.

▮▮▮▮ Therefore, when the promisor has anticipated a particular event by specifically providing for it in a contract, he should be relieved of liability for the occurrence of such event regardless of whether it was foreseeable.[97] *See Edward Maurer Co. v. Tubeless Tire Co.,* 6 Cir., 1922, 285 F. 713, 714–15. As Justice Traynor noted for the California Supreme Court under different but nonetheless analogous circumstances,

> the question whether a risk was foreseeable is quite distinct from the question whether it was contemplated by the parties. . . . When a risk has been contemplated and voluntarily assumed . . . foreseeability is not an issue and the parties will be held to the bargain they made.

*Glenn R. Sewell Sheet Metal, Inc. v. Loverde,* 1969, 70 Cal.2d 666, 451 P.2d 721, 728 n. 13; *see Lloyd v. Murphy, supra,* 153 P.2d at 50. In this case, it is clear that Eastern specifically "contemplated and voluntarily assumed" the risk that deliveries would be

delayed by governmental acts, priorities, regulations or orders. Moreover, unlike the only case cited to us by Eastern which construes a similar provision, *United States v. Brooks-Callaway Co.,* 318 U.S. 120, 63 S.Ct. 474, 87 L.Ed. 653 (1943), there is no indication from the wording of the excusable delay clause that McDonnell's defenses are to be limited to breaches caused by unforeseeable events. Therefore, we must conclude that the trial judge erred in instructing the jury that the events specifically listed in the excusable delay clause must have been unforeseeable at the time the contracts were entered into for McDonnell to claim exemption from liability.[98]

3. *Informal Demands for Priority as an "Act of Government"*

▮▮▮ Turning next to the question of whether the Government's informal priorities policy came within the ambit of the excusable delay clause, we have seen in Part IV–A of this opinion that McDonnell and its suppliers, in granting priority to the military, were cooperating with the established, publicly announced procurement policy of the Federal Government. Eastern contends, however, that this informal program did not come within the scope of the contract clause specifically excusing "any act of government, governmental priorities, allocations, or orders affecting materials." Asserting that the Defense Production Act authorizes the Government to obtain precedence for certain orders only by means of formal, published regulations, Eastern concludes that any other method is illegal, if not unconstitutional, and therefore cannot be deemed an act of Government. We disagree for the following reasons.

---

97. Foreseeability may be a factor in determining whether the intervening event is caused by an allegedly negligent act of the promisor. Of course, the term has a completely different meaning and purpose in this context. *See* W. Prosser, *Handbook of the Law of Torts,* §§ 31, 43–44 (4th ed. 1971).

98. McDonnell also argues that the trial judge erred in narrowing the excuses available as a result of its suppliers' delays to those available to McDonnell directly. In McDonnell's view, it should be exonerated for any delays caused by

its subcontractors regardless of whether these delays were the subcontractors' fault. This construction, however, would write out of the excusable delay clause the parenthetical expressly limiting excusable vendor-caused delays to those "due to causes similar to those within the scope of this clause." For this phrase to have any meaning, it must be construed as limiting excusable vendor-caused delays to those beyond a vendor's control and not due to his negligence.

The Defense Production Act, in "a sweeping delegation of power," [99] grants the President broad authority to require that defense-related contracts be given precedence over less essential orders. D.P.A. § 101(a), 50 App.U.S.C. § 2071(a).[100] Congress created no detailed scheme by which this power was to be exercised, providing only that "[t]he President may make such rules, regulations, and orders as he deems necessary or appropriate." D.P.A. § 704, 50 App.U.S.C. § 2154.[101] There is, moreover, nothing in either the legislative history of the D.P.A.[102] or in the wording of the Act itself which gives any indication that the Government may not seek compliance with its priorities policies by informal means.[103] It is reasonable to conclude, therefore, that Congress intended to accord the Executive Branch great flexibility in molding its priorities policies to the frequently unanticipated exigencies of national defense.

This conclusion is reinforced by the fact that the Defense Production Act of 1950 was enacted in the face of established legal authority which had consistently construed previous procurement statutes as authorizing informal and indirect methods of securing compliance with the Government's military priorities policy. *E. g., L. N. Jackson & Co. v. Royal Norwegian Government,* 2 Cir., 1949, 177 F.2d 694, *cert. denied,* 339 U.S. 914, 70 S.Ct. 574, 94 L.Ed. 1340 (1950); *Roxford Knitting Co. v. Moore & Tierney, Inc.,* 2 Cir., 265 F. 177, *cert. denied,* 253 U.S. 498, 40 S.Ct. 588, 64 L.Ed. 1032 (1920); *Dorsey v. Oregon Motor Stages,* 1948, 183 Or. 494, 194 P.2d 967; *Tidewater Portland Cement Co. v. Lincoln,* 1923, 142 Md. 193, 120 A. 365; *Nitro Powder Co. v. Agency of Canadian Car & Foundry Co.,* 1922, 233 N.Y. 294, 135 N.E. 507; *Mawhinney v. Millbrook Woolen Mills, Inc.,* 1921, 231 N.Y. 290, 132 N.E. 93; *Tipler-Grossman Lumber Co. v. Forrest City Box Co.,* 1921, 148 Ark. 132, 229 S.W. 17, 19–20; Pedrick & Springfield, War Measures and Contract Liability, 20 Texas L.Rev. 710, 719 (1942); Dodd, Impossibility of Performance of Contracts Due to War-Time Regulations, 32 Harv.L.Rev. 789, 796–805 (1919); *cf. Texas Co. v. Hogarth Shipping Corp.,* 256 U.S. 619, 41 S.Ct. 612, 65 L.Ed. 1123 (1921). It was recognized that, for reasons of practical necessity, urgently needed government orders had to be obtained "by non-mandatory directions based ultimately on the powers of compulsion rather than by the actual exercise of the statutory compulsive powers." Dodd, Impossibility of Performance of Contracts Due to War-Time Regulations, 32 Harv.L. Rev. 789, 798 (1919). The military's need for speed and flexibility in directing the flow of necessary materials precluded a ponderous bureaucratic procurement process. Thus, even though the World War I National Defense Act, 39 Stat. 213 (June 3, 1916), specifically provided that either the President or a department head placed priorities orders, several decisions held that literal compliance with this requirement was not necessary. *Roxford Knitting Co. v. Moore & Tierney, Inc., supra; Mawhinney v. Millbrook Woolen Mills, Inc., supra.*

In both *Roxford Knitting* and *Mawhinney,* it was asserted that because the

**99.** Note, The Defense Production Act: Choice as to Allocations, 51 Colum.L.Rev. 350 (1951).

**100.** Quoted in full at note 68 *supra.*

**101.** Quoted at note 69 *supra.*

**102.** *See* Note, The Defense Production Act: Choice as to Allocations, 51 Colum.L.Rev. 350, 351 n. 6, 358 & n. 71 (1951).

**103.** Eastern's reliance on *The Steel Seizure Case* is therefore misplaced. *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). In that case, the Supreme Court held that the Defense Production Act did not implicitly authorize the seizure of a plant as a means of preventing work-stoppages because, in 1947, the Congress had rejected an amendment to the labor laws which would have explicitly permitted such an action. *Id.* at 586, 72 S.Ct. at 866, 96 L.Ed. at 1167. Consequently, the President's seizure of the Youngstown mills was held invalid because:

> The Defense Production Act affords no ground for the suggestion that the 1947 denial to the President of seizure powers has been impliedly repealed, and its legislative history contradicts such a suggestion.

*Id.* at 607, 72 S.Ct. at 895, 96 L.Ed. at 1177 (Frankfurter, J., concurring).

government orders were in the form of an ordinary contract and were signed by relatively low-ranking officials, the materials involved were not legally requisitioned, and therefore were obtained merely as the result of a voluntary agreement. The courts, however, permitted the Government wide latitude in its methods of securing precedence for military orders. Applying a pragmatic test to determine whether the transaction conformed with the priorities act, the *Roxford Knitting* court stated:

·And when a manufacturer is given to understand that he is required to supply certain goods to the government of the United States, and is told that he has no option to decline to comply, we are satisfied that as to those goods an "order" has been placed or received, within the spirit and intent and the letter of the statute, whether the authoritative direction is written or oral, and notwithstanding the fact that the parties actually come to an agreement in what has the form of a contract. Substance is not to be sacrificed in such cases to form.

265 F. at 191; *accord Mawhinney v. Millbrook Woolen Mills, Inc., supra,* 231 N.Y. at 300, 132 N.E. at 96.

During World War II, a similarly liberal view was taken of the Government's procurement authority. *See Dorsey v. Oregon Motor Stages,* 1948, 183 Or. 494, 194 P.2d 967; Pedrick & Springfield, War Measures and Contract Liability, 20 Texas L.Rev. 710, 719 (1942); Brown, The Effect of Conscription of Industry on Contracts for the Sale of Goods, 90 U.Pa.L.Rev. 533, 546 & n. 82 (1942); *cf. Alexewicz v. General Aniline & Film Corp.,* Sup.Ct.1943, 181 Misc. 181, 43 N.Y.S.2d 713, 723–25. Inasmuch as the D.P.A., in significant respects, contains the language of the World War II statute,[104] it is unlikely that there was any intention to redirect, *sub silentio,* the trend of judicial construction in this area. In fact, the

D.P.A. appears to accord the President broader powers than those granted in World War II. Note, The Defense Production Act: Choice as to Allocations, 51 Colum.L.Rev. 350 n. 2 (1951).

There can be little question, then, that the Defense Production Act granted the Government authority to seek compliance with its priorities programs by informal means of persuasion whether written or oral.[105] For this reason, many of the decisions relied on by Eastern are inapposite here. *E. g. Northern Pacific Ry. v. American Trading Co.,* 195 U.S. 439, 25 S.Ct. 84, 49 L.Ed. 269 (1904).

We note, moreover, that this case precisely fits an established pattern of decisions rejecting the contention that breaches of contract are excused only by formal or technical acts of Government. Whether predicated on a contractual provision or simply on the common law defense of impossibility these decisions indicate in the clearest terms that fundamentally coercive acts of Government, whatever their form, constitute an excuse for breach. Thus, a promisor is not liable merely because the government order causing a breach is technically deficient. *Texas Co. v. Hogarth Shipping Corp.,* 256 U.S. 619, 41 S.Ct. 612, 65 L.Ed. 1123 (1921). Neither is he required to resist a government requisition in order to be excused from performance. *The Claveresk,* 2 Cir., 1920, 264 F. 276. As the *Claveresk* court observed, "it would be 'a strange law' which required . . . [a promisor] to resist, 'till the hand of power was laid upon him, an order which it was his duty to obey'." 264 F. at 280–81. The Supreme Court, moreover, has excused breaches caused by a promisor's anticipation of government action. *The Kronprinzessin Cecilie,* 244 U.S. 12, 37 S.Ct. 490, 61 L.Ed. 960 (1917). Writing for the Court, Mr. Justice Holmes found the impossibility doctrine applicable to a ship which returned to port

---

**104.** *See* The Second War Powers Act ch. 199, § 301, 56 Stat. 177 (1942).

**105.** Even if we were to conclude that the D.P.A. did not authorize informal priority efforts, McDonnell would be exonerated by a

provision of the Act which exculpates any compliance with a government order regardless of whether it is later determined to be invalid. 50 App.U.S.C. § 2157. This provision is discussed in the following section of this opinion.

in expectation of World War I but before its actual declaration:

> [I]t hardly could change . . . [the ship owner's] liability that he prophetically and rightly had anticipated the . . [war] by twenty-four hours. We are wholly unable to accept the argument that although a shipowner may give up his voyage to avoid capture after war is declared, he never is at liberty to anticipate war.

244 U.S. at 24, 37 S.Ct. at 492, 61 L.Ed. at 966. Thus, the "apprehension of restraint, something much less than actual government compulsion, may suffice to dissolve the obligation of a contract." *The Claveresk, supra,* 264 F. at 282.

In a similar manner, decisions arising under previous versions of the Defense Production Act have focused upon "the reality of coercion" rather than the form which it may have taken. *L. N. Jackson & Co. v. Royal Norwegian Government, supra,* 177 F.2d at 699; *see Roxford Knitting Co. v. Moore & Tierney, Inc., supra,* 265 F. at 191; *Dorsey v. Oregon Motor Stages, supra,* 194 P.2d at 983; *Nitro Powder Co. v. Agency of Canadian Car & Foundry Co., supra,* 135 N.E. at 508. Courts have held, therefore, that, where compulsion is actually present, a vendor is justified in complying with a government request for priority, no matter how informally presented or politely phrased that demand may have been. *See, e. g., Roxford Knitting Co. v. Moore & Tierney, Inc.,* N.D.N.Y., 1918, 250 F. 278, 286, *aff'd,* 2 Cir., 265 F. 177, *cert. denied,* 253 U.S. 498, 40 S.Ct. 588, 64 L.Ed. 1032; *Mawhinney v. Millbrook Woolen Mills, supra,* 132 N.E. at 96; 6 A. Corbin, Contracts

§ 1345 at 425 n. 23 (1962). As one commentator has noted, a court would be

> taking an entirely artificial and unrealistic position in holding that a practice deliberately adopted by the executive and enforceable through the exercise of powers granted by the legislature will not be treated by the judiciary as governmental action which private citizens are justified in obeying. The refusal by the courts so to treat it will result, from the standpoint of defendants, in protecting only the unusually cautious and the unusually recalcitrant. . . .

Dodd, Impossibility of Performance of Contracts Due to War-Time Regulations, 32 Harv.L.Rev. 789, 799 (1919).

 Eastern contends, however, that these authorities are not applicable here because the B.D.S.A.'s published regulations guaranteed "DO"-rated civilian orders "equal preferential status" with similarly rated military contracts. Regulation 2 § 3(b)(2), 18 Fed.Reg. 1684 (1953). It is Eastern's view that because the Government was violating its own regulations, McDonnell could have successfully resisted its demands.[106] The priority enjoyed by commercial aircarrier manufacturers, though, was a privilege granted by the same officials responsible for the informal jawboning policy which prevailed during the Vietnam War. Inasmuch as the program was approved by Bryant—who had complete authority to remove the "DO" rating accorded the aviation industry—and administered by Zepp—who had the power to summarily issue supervening directives and "DX" ratings—it would have been futile for McDonnell or its suppliers to resist the Government's demands for priority.[107] In

---

**106.** Eastern also contends that, under the Administrative Procedure Act, it was entitled to rely upon its DO rating. Section 3 of the Act provides, in part, that "a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published." 5 U.S.C. § 552(a)(1). Even assuming that the Government's informal method of obtaining priorities had to have been published, the A.P.A. is clearly not applicable to this case. The above-quoted provision is specifically limited to persons not having "actual and timely

notice" of the unpublished information. *See Kessler v. F. C. C.,* 1963, 117 U.S.App.D.C. 130, 326 F.2d 673, 690; *United States v. Aarons,* 2 Cir., 1962, 310 F.2d 341, 347–48. As we have seen, Eastern by its own admission, was well aware of the Government's policy. *See* notes 57–59 *supra.*

**107.** Failure to perform a contractual obligation may be excused even though an attempt to do so may only have *appeared* to be futile. For example, one court has held that even illegal acts of government could serve as an excuse

short, the preferential status accorded some civilian contracts under the Defense Production Act was not a right which ran to the parties to those agreements but rather an instrument of national defense policy to be employed at the discretion of the executive.

Consequently, we will not permit the form of the military priorities policy to disguise what was in substance a governmental act beyond the control of McDonnell Douglas. The excusable delay clause cannot be made to turn on a distinction which for so long has been held to be entirely artificial and unrealistic. As Mr. Justice Holmes stated in a very similar context, "[b]usiness contracts must be construed with business sense, as they naturally would be understood by intelligent men of affairs." *The Kronprinzessin Cecilie, supra,* 244 U.S. at 24, 37 S.Ct. at 492, 61 L.Ed. at 966.

This approach, moreover, is consistent with that required under the Uniform Commercial Code. In Comment 10 to section 615, the draftsmen of Article 2 stated:

> Following its basic policy of using commercial practicability as a test for excuse, this section . . . disregards any technical distinctions between "law," "regulation," "order" and the like. Nor

does it make the present action of the seller depend upon the eventual judicial determination of the legality of the particular governmental action. The seller's good faith belief in the validity of the regulation is the test under this Article and the best evidence of his good faith is the general commercial acceptance of the regulation.

Given McDonnell's unquestioned good faith in complying with the Government's demands for priority and the uncontroverted evidence of the entire aviation industry's acceptance of the policy, we must hold as a matter of law that McDonnell is not liable for any delivery delay proximately resulting from the informal procurement program.

**C. Exoneration under the Defense Production Act**

■ Even if the contract clause did not apply to informal government pressures, McDonnell asserts that delays resulting from this policy were nevertheless excused under the Defense Production Act. Section 707 of the D.P.A., in relevant part, provides that

> No person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from

for nonperformance. *J. & G. Lippman v. Rice Millers' Distrib. Co.,* 1924, 156 La. 471, 100 So. 685, 687. A contrary view, however, is evident in *Roxford Knitting Co. v. Moore & Tierney, Inc., supra:*

> [I]t is not decisive to ascertain what the plaintiff or the [government employee] thought was being done, or intended to do. The real question is as to what in fact was done. In order that civil contracts should be postponed by "orders" subsequently placed by the government, it is necessary that those orders should be placed in accordance with the commandeering act, if the act indicates the method to be pursued. If officials of the War and Navy Departments entertain erroneous views of their power and of the construction to be placed upon an act of Congress, their decision cannot make it the duty of the courts to perpetuate the error, and override the statute, and deprive individuals of their contract rights.

265 F. at 190 (dictum).

As will be discussed below, this issue has been resolved by section 707 of the D.P.A., 50 App.U.S.C. § 2157, which excuses all breaches resulting from compliance with a government order whether or not it is subsequently determined to be invalid. We note further, though, that the legality of a government act, while relevant, should not be the only factor considered in impracticability cases. Under section 2–616 of the Code, a good faith, commercially reasonable belief in the validity of a governmental interference with a contract would justify exoneration of the promisor. *See* Uniform Commercial Code § 2–615, Comment 10; *cf. The Kronprinzessin Cecilie,* 244 U.S. 12, 23–24, 37 S.Ct. 490, 492, 61 L.Ed. 960 (1917). As one court has demonstrated, in an analogous case, all the circumstances surrounding a breach which is claimed to be excused because of a supervening event should be examined to determine whether the promisor acted reasonably in failing to perform. *Paper Makers Importing Co. v. City of Milwaukee,* E.D.Wis., 1958, 165 F.Supp. 491.

compliance with a *rule, regulation, or order issued pursuant to this Act* . . . , notwithstanding that any such rule, regulation, or order shall thereafter be declared by judicial or other competent authority to be invalid.

50 App.U.S.C. § 2157 (emphasis added). Eastern argues for a narrow construction of this provision, asserting that the Government's requests in this case could not be considered "order[s] issued pursuant to" the D.P.A. It is Eastern's position that the exculpatory provision extends only to government requisitions which are issued in strict accordance with published regulations and which "contain the threat of some sanction for failure to obey." In other words, Eastern contends that, despite the Act's exoneration of persons complying with illegal orders, Congress nevertheless intended to narrow the common law impossibility defense to only those breaches resulting from formally issued and technically worded requisitions. Thus, while one supplier would be exempt because of his compliance with a technically sufficient but substantively invalid order, another would be held liable for acceding to a government demand which was ultimately within the Government's power to enforce but which was deficient in some formal sense. There is nothing in the Defense Production Act or its history which requires this unreasonable result.

■ This Court has already expressed the view that aside from section 707's exoneration of breaches resulting from compliance with priority orders subsequently held to be invalid, the provision "is simply declaratory of the common law [doctrine of impossibility]." *United States v. Texas Construction Company,* 5 Cir., 1955, 224 F.2d 289, 293. As we have seen above, the Government's procurement policy clearly gives rise to a defense under this doctrine.

Other courts, moreover, have repeatedly held that the term "order" as it has been used in previous procurement statutes includes informally presented requests for priority. *See, e. g., Roxford Knitting Co. v. Moore & Tierney, supra; Mawhinney v. Millbrook Woolen Mills, supra.* In the absence of any definition of the term in the D.P.A., there is no reason why the construction given "order" under the World War I priority acts should not be applicable to this case:

> It must be admitted that neither the National Defense Act nor the Navy Purchase Act prescribe any stereotyped form of order which must be used. An order might be placed under the form and terms of polite request. It is left to the discretion of the government to determine the manner in which orders are to be placed, and how its intentions are to be communicated, orally or by writing.

*Roxford Knitting v. Moore & Tierney, supra,* 265 F. at 188. The similarly worded exoneration provision found in the World War II procurement acts [108] has been analyzed as applying to defaults resulting from any steps taken by the Government to carry out its priority requirements. *L. N. Jackson & Co. v. Royal Norwegian Government, supra,* 177 F.2d at 701–702 (dictum); *see Dorsey v. Oregon Motor Stages, supra.* We find nothing in the legislative history of section 707 or its World War II ancestor which indicates that Congress intended it to have a narrower application.[109] *See* H.R.

---

**108.** The Second War Powers Act, ch. 199, § 301, 56 Stat. 177, 180 (1942), provided in relevant part:

> No person shall be held liable for damages or penalties for any default under any contract or order which shall result directly or indirectly from compliance with this subsection (a) or any rule, regulation or order issued thereunder, notwithstanding that any such rule, regulation or order shall thereafter be declared by judicial or other competent authority to be invalid.

**109.** Eastern's construction of the term "order" is at odds with the B.D.S.A.'s own published regulations. Section 22 of Regulation 2 states that

> No person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation or order of NPA [now BDSA] (*including any direction, directive or other instruction*), notwithstanding that any such rule, regulation or order shall thereafter be declared by judicial or other competent authority to be invalid.

Rep.No.460, 77th Cong., 1st Sess., 4–6 (1941); Hearing on S. 3936 before the Senate Committee on Banking and Currency, 81st Cong., 2d Sess. 292 (1950); 87 Cong. Rec. 3799–3803 (1941) (remarks of Rep. Vinson, sponsor of H.R. 4534); Frey, Contract Defaults and Cancellations in Wartime, 38 Ill.L.Rev. 167, 169–70 (1943).

To the contrary, the legislative hearings on the D.P.A. evidenced a strong congressional preference for nonmandatory civilian cooperation with the Government's procurement policies. See Hearings before Committee on Banking and Currency on S. 3936, 81st Cong., 2d Sess. 82, 87, 93, 95 (1950); Note, The Defense Production Act: Choice as to Allocations, 51 Colum.L.Rev. 350, 358 (1951). The Secretary of Commerce, moreover, testified during the D.P.A. hearings that voluntary methods would be used before the Government actually invoked its priorities powers and that the threat of mandatory powers would be used as a "big stick" to induce voluntary cooperation. Hearings before Committee on Banking and Currency on S. 3936, 81st Cong., 2d Sess. 82–95 (1950); see Hearings before Committee on Banking and Currency on H.R. 9176, 81st Cong., 2d Sess. 106 (1950).

We have already indicated that a cumbersome and inflexible administrative process is antithetical to the pressing necessities of military procurement. This, however, would be the inevitable result of a narrow construction of section 707. As the Congress recognized, a flexible and efficient program is best achieved through prompt and willing civilian cooperation with government requests for priority. See Note, Impossibility of Performance Due to War-Time Governmental Interference, 28 Va.L.Rev. 72, 78–79 (1941). If the D.P.A.'s exoneration provision were given a narrow and technical construction, vendors would insist that all government orders meet rigid specifications. See Brown, The Effect of Conscription of Industry on Contracts for the Sale of Goods, 90 U.Pa.L.Rev. 533, 545 n. 76, 547 n. 87 (1942). As the New York

Court of Appeals stated in *Mawhinney v. Millbrook Woolen Mills, supra,*

> The one who gave his service with alacrity . . . should at least be considered with as much favor as he who held back until threatened or his property commandeered. The laggard who feared the financial results under his civilian contracts merits no encouragement. . . . The act of Congress, the necessity of the times, brooked no delay.

132 N.E. at 96; *accord,* Dodd, Impossibility of Performance of Contracts Due to War-Time Regulations, 32 Harv.L.Rev. 789, 799 (1919).

In summary, then, we hold that the informal but nonetheless concerted government priorities policy in effect during the life of the contracts at issue in this case comes well within the terms of both the excusable delay clause and section 707 of the Defense Production Act. Therefore, McDonnell is excused under either of these provisions for any delays proximately resulting from the Government's priorities policy. We also conclude that the trial judge erred in instructing the jury that military priorities or any other event specifically provided for in the excusable delay provision must have been unforeseeable at the time of contracting. And finally, we hold that McDonnell was entitled to raise any defense available to it under the impracticability doctrine found in U.C.C. section 2–615. These errors by the District Judge deprived McDonnell of the substance, if not the form, of the defense accorded it by both contract and statute, and therefore necessitate our reversal of the judgment below.

## V. The Determination of Eastern's Damages

During the six-week damages phase of this bifurcated trial, the jury was confronted with a staggering array of highly technical evidence concerning the lost profits, surplus pilot expenses, wasted pilot training and rescheduling costs which Eastern alleges it suffered as a result of the delivery

18 Fed.Reg. 1684 (1953) (emphasis supplied). Certainly a government demand need not be in

the form of a priority rating in order to constitute a "direction" or an "instruction."

delays. The complexity of the airline business and its special sensitivity to economic and market fluctuations made the determination of Eastern's lost profits especially difficult. This is best reflected, perhaps, by the extreme variation between the estimates provided by the parties' experts.[110] Eastern's primary witness on the damages issue, Mr. Wemple, estimated that the delivery delays caused the airline to lose $23,400,000 in profits. McDonnell's expert, Mr. Simat, on the other hand, estimated that Eastern saved at least $1,294,000 because the planes were not delivered on time.[111] Throughout the damages trial, therefore, each side undertook extensive cross-examination of the other's witnesses in an effort to account for this $24,600,000 discrepancy.

At trial and on appeal, McDonnell has vigorously contested several of the basic assumptions underlying Eastern's estimate of its damages. McDonnell relies on the established proposition that an expert's opinion as to lost profits and other damages must be predicated on assumptions which have a reasonable basis in the evidence.

*See, e. g., Terrell v. Household Goods Carriers' Bureau*, 5 Cir., 1974, 494 F.2d 16, 22–24; *Benham v. World Airways, Inc.*, 9 Cir., 1970, 432 F.2d 359, 360–61.

■ It is not enough, however, that several of Wemple's assumptions may be open to question.[112] Instead, the issue is whether the probative value of the expert's testimony was so slight that it should not have been submitted to the jury. *Greene v. General Foods Corp.*, 5 Cir., 1975, 517 F.2d 635, 666.[113] A jury's award of damages, therefore, may have adequate support in the evidence even though an expert's assumptions and methodology may not have been the only permissible ones for determining damages. *See id.* at 666 n. 23.

Rather than anticipate the relitigation of this issue, we pretermit any assessment of the Wemple testimony. We do, however, make several suggestions which the District Court may consider in the event that a retrial of Eastern's damages claims becomes necessary. In our view, the trial judge is obliged to scrutinize most carefully un-

110. The primary witnesses for each side had each presented similarly contrasting views in a case involving the damages suffered by Trans World Airlines because of a failure to deliver a number of aircraft. *Trans World Airlines, Inc. v. Hughes*, S.D.N.Y., 1969, 308 F.Supp. 679, *aff'd*, 2 Cir., 1971, 449 F.2d 51; *rev'd on other grounds*, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973).

111. Mr. Simat estimated that, as a result of late deliveries, Eastern suffered a loss in operating profit of at most $0.3 million. This loss, in Mr. Simat's view, was more than offset by the added costs of capital Eastern would have incurred in order to obtain and pay for the Douglas aircraft. These added costs, which were not considered by Mr. Wemple, were estimated as being over $1.6 million.

112. McDonnell's primary contention is that there is no basis in the evidence for Mr. Wemple's assumption that the 3 per cent increase in capacity which would have resulted from timely deliveries would have been matched by an equivalent increase in passenger traffic. However, McDonnell also argues that Wemple's use of "system wide average passenger yields" overstated the gross revenues which Eastern would have received because the airline's yields on Douglas jets were substantially lower than the system average. McDonnell contends further that Wemple assigned additional passenger traffic and revenue to Eastern's shuttle services when, in fact, all passengers desiring to use this service were being accommodated. Another Wemple assumption challenged by McDonnell is that 20 per cent of Eastern's costs—$164.5 million—would not have increased at all even if the Douglas planes had been delivered on time. McDonnell also claims that it was speculative for Wemple to assume that Eastern would have derived extra cargo income on a percentage basis equivalent to the assumed increase in passengers. Finally McDonnell attacks Wemple's failure to deduct from Eastern's estimated lost profits the cost of financing those aircraft which were purchased rather than leased.

113. Both *Terrell, supra,* and *Greene* were actions brought under the Sherman Act. The proof of damages in private antitrust suits is significantly less arduous than is usually the case in other actions. *See Greene v. General Foods Corp., supra,* 517 F.2d at 662. Therefore, our reliance on *Terrell* and *Greene* should not be taken as indicating that in this case, Eastern must not be held to the traditional rule against speculative or conjectural estimates of damages in contract actions. *See Center Chemical Co. v. Avril, Inc.,* 5 Cir., 1968, 392 F.2d 289, 291.

usually technical or complicated expert testimony. A court must be mindful of the particular difficulties that can arise when a plaintiff resorts, in Judge Friendly's words, "to an array of figures conveying a delusive impression of exactness in an area where a jury's common sense is less available than usual to protect it." *Herman Schwabe, Inc. v. United Shoe Machinery Corp.*, 2 Cir., 1962, 297 F.2d 906, 912, *quoted with approval* in *Greene v. General Foods Corp., supra*, 517 F.2d at 665–66.

█ The District Court must do more than merely weigh the probative value of an expert's testimony considered as a whole. Where practical, a trial judge should exclude particular assumptions or other aspects of an expert's testimony which considered individually do not meet the "minimum of probative value." [114] *Herman Schwabe, Inc. v. United Shoe Machinery Corp., supra*, 297 F.2d at 912. This more detailed scrutiny is necessary because some telling errors may become virtually unreviewable once the jury has returned its verdict.

█ In this case, for example, Wemple should have considered whether Eastern's estimated loss of profits was reduced by the cost of financing those planes which were purchased rather than leased.[115] McDonnell argues that this was an error which overstated the airline's lost profits by $1.6 million. However, because Eastern was awarded only 85 per cent of the damages estimated by Wemple, it cannot be said that McDonnell's cross-examination did not bring this point home to the jury. In complicated or technical cases, therefore, an expert's testimony should be cleansed of unsupportable assumptions or clear errors which have less than the minimum of probative value. This would reduce the possibility of a confused jury and an arbitrary verdict.

██ Finally, we note that the District Court has the discretion to call an expert witness on its own. *See Danville Tobacco Assoc. v. Bryant-Buckner Associates, Inc.*, 4 Cir., 1964, 333 F.2d 202, 208–209, *cert. denied*, 387 U.S. 907, 87 S.Ct. 1688, 18 L.Ed.2d 624 (1967); *Scott v. Spanjer Bros., Inc.*, 2 Cir., 1962, 298 F.2d 928; Judicial Conference of the United States, *Handbook of Recommended Procedures for the Trial of Protracted Cases*, 25 F.R.D. 351, 421–22 (1960); C. McCormick, *Handbook of the Law of Evidence* § 17 (1954); C. Wright & A. Miller, *Federal Practice and Procedure* § 2239 at 696 (1970), § 2602 at 778–79 (1971). The unusual difficulty of estimating a major airline's lost profits resulting from extensive delays stretching over a period of three years and involving 90 jet aircraft suggests to us that the jury might benefit from the testimony of a neutral expert in this case. Because a court-appointed witness would be unconcerned with either promoting or attacking a particular estimate of Eastern's damages, he could provide an objective insight into the $24.5 million difference of opinion between the parties' experts. Indeed, the mere presence of a neutral expert may have, in Judge Prettyman's phrase, "a great tranquilizing effect" on the experts retained by Eastern and McDonnell. Proceedings of the Seminar on Protracted Cases for United States Circuit and District Judges, 21 F.R.D. 395, 469 (1957).

## VI. Conclusion

Because of serious errors committed by the District Judge on a number of important and decisive questions of law—especially those relating to Eastern's obligation

---

114. Frequently, this may be possible only by means of a curative instruction given to the jury after the expert has testified.

115. McDonnell estimates that, had the aircraft been delivered as originally planned, Eastern would have borrowed $113 million at the time of delivery for the purchase. In *Trans World Airlines, supra*, both the District Court and the Second Circuit specifically approved of deducting interest costs from estimates of loss profits due to delivery delay. *Trans World Airlines v. Hughes, supra*, 308 F.Supp. at 694, *aff'd*, 449 F.2d at 79.

to give timely notice of breach of contract and McDonnell's Vietnam War defense— the judgment rendered below is reversed and remanded for a new trial. Our disposition of this case makes it unnecessary for us to consider the issues raised by Eastern in its cross-appeal.

REVERSED AND REMANDED FOR A NEW TRIAL.